664 So.2d 792 (1995)
Russell SLOAN, Plaintiff-Appellee,
v.
Trennion T. DAILEY, Town of Vinton, Safety Council of Southwest Louisiana & Cigna Companies, Defendants-Appellants.
No. 95-906.
Court of Appeal of Louisiana, Third Circuit.
December 6, 1995.
*795 Thomas E. Townsley, Lake Charles, for Russell Sloan.
Dennis R. Sumpter, Sulphur, for Trennion T. Dailey, et al.
Lester Allan Robertson, for Safety Council of S.W. Louisiana.
Before: DOUCET, C.J., and COOKS and PETERS, JJ.
DOUCET, Chief Judge.
The defendants, Trennion T. Dailey and the Town of Vinton (the town), appeal the trial court's judgment finding them at fault in the injury to the plaintiff, Russell Sloan.
The Safety Council of Southwest Louisiana assigned Sloan to do community service work for the Town of Vinton's Electrical Department, in connection with a drunk driving offense. Sloan is an inside electrician. The town supervisor, Raymond Guillory, assigned Sloan to work with Trennion Dailey, a regular electrical department employee, installing utility poles. On September 8, 1992, the two men loaded two utility poles on a winch truck. Dailey secured the poles to the truck by tying the winch line around them. Dailey drove to the appropriate location with Sloan in the passenger seat. They unloaded the first pole and, after so doing, failed to secure the winch line around the remaining pole. There is conflict as to what happened next. Sloan states that he was in the back of the truck throughout the unloading of the first pole. He alleges that Dailey told him to stay there while they drove about 100 feet to the next location. Dailey, however, testified that Sloan was on the ground guiding the pole and got onto the truck to ride to the next site, without his (Dailey's) knowledge. He admits, however, that he did not tell Sloan not to get on the truck. They reached the next site without incident. However, while Dailey was trying to get the truck off the road, the remaining pole rolled onto Sloan. He tried to stop the log with his left hand. The hand bent backwards, sustaining a dorsi-flexion injury.
Sloan brought this suit against Dailey, the Town of Vinton, individually and as the employer *796 of Dailey, the Safety Council of Southwest Louisiana and its insurer, Cigna Companies. After a trial on the merits, the trial judge rendered judgment allocating fault 20% to Sloan, 50% to Dailey and 30% to the town. He gave oral reasons for his finding. The judge took the quantum of damages under advisement. Ultimately, he awarded damages as follows:

(a) Past, Present and Future
Pain, Suffering, Disability
and Mental Anguish $15,000.00
(b) Loss of Enjoyment of Life 15,000.00
(c) Medical Expenses 2,916.32
(d) Lost Earning Capacity 10,000.00

The trial judge issued written reasons for the award of damages.
The town and Dailey appeal the finding of liability, the apportionment of fault and the award of damages. Sloan has answered the appeal arguing that no fault should have been assessed to him and that the award of general damages was insufficient.

LIABILITY OF THE DEFENDANTS
The defendants argue that they were not under a duty to protect Sloan from the risk of injury which he encountered. They argue that Sloan's injuries were caused by his own negligence. The Town's duty must be analyzed separate and apart from any knowledge the plaintiff had or should have had of the danger he was encountering. Socorro v. City of New Orleans, 579 So.2d 931 (La. 1991).
To determine whether the defendants are liable, we will apply a duty-risk analysis, by asking:
1) Was the act or omission complained of a cause-in-fact of the harm?
2) Did the defendant owe a duty to protect this plaintiff from this type of harm arising in this manner?
3) Did the defendant violate the duty?
Therefore, we must consider whether the conduct of the defendants was a cause-in-fact of the injury to Sloan.
An act of omission is considered to be a cause-in-fact of harm to another if it was a "substantial factor" in bringing about the accident. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970); Lejeune [LeJeune] v. Allstate Ins. Co., 365 So.2d 471 (La.1978). Restatement of Torts 2, Sections 431-33 (1965). As noted in the restatement, factors which may be considered in determining whether the actor's negligence is a substantial factor include "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm ..."
The "substantial factor" test is akin to the `but for' test (i.e. the accident would not have happened but for the defendant's negligence), except that where more than one party's negligence would have caused the accident absent the other party's negligence, Dixie, supra, and Lejeune [LeJeune], supra, hold both to be causative.
As succinctly stated by the Louisiana Supreme Court in Lejeune [LeJeune], supra:
"As Prosser [on Torts, Section 41 at pp. 237-38 (4th Ed.1971)] notes, the `but for' test (that the accident would not have happened but for the defendant's negligence), while it explains the greater number of cases, does not serve as an adequate test for the present situation: `If two causes occur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result, some other test is needed ...' In such cases it is quite clear that each cause has in fact played so important a role in producing the result that responsibility should be imposed upon it; and it is equally clear that neither can be absolved from that responsibility upon the ground that the identical harm would have occurred without it, or there would be no liability at all. Id., p. 239"
Trahan v. State, Department of Transportation and Development, 536 So.2d 1269, 1272 (La.App. 3rd Cir.1988), writ denied, 541 So.2d 854 (La.1989).
The trial judge found that, Sloan was negligent in placing himself in the path of the pole, which he must have known was unsecured and could roll. However, he found that both the town and Dailey were also *797 negligent. He found that the town was negligent in failing to provide adequate training and safety policies. He further found that Dailey was negligent in failing to look out for the safety of his passenger. He found that had Dailey been looking out for the safety of Sloan, he would have made himself aware of Sloan's position. Had he done so he could have either told Sloan to get out of the truck or secured the log. The record reflects that Dailey backed the truck over an uneven surface while carrying an unsecured pole. According to Sloan's testimony, Dailey backed the truck into a ditch. The defendants argue that we should look no further than the negligence of Sloan. Our review of the evidence convinces us that the combined negligence of Sloan, the town and Dailey caused the accident. The negligence of each was a substantial factor in the accident. Having so determined, we must next decide whether the defendants owed a duty which encompassed the risk to which the plaintiff was exposed in this case.
The trial judge, in analyzing the liability of the town, found that it has a duty to community service workers. We agree. As the result of a criminal offense, Sloan has been sentenced to perform community service with the town's electrical department. The work he does and the persons under whom he works are out of his control. The town, as supervisor and beneficiary of such workers has, we believe, the obligation to provide the community service workers with a working place and conditions which are reasonably safe considering the nature of the work, as have ordinary employers. The town is not required to insure the safety of community service workers. It must, however, exercise reasonable care to protect them against unreasonable risk of foreseeable harm. See Duhon v. Calcasieu Parish Police Jury, 517 So.2d 1016 (La.App. 3 Cir. 1987); and Brewington v. Louisiana Dept. of Corrections, 447 So.2d 1184 (La.App. 3 Cir. 1984). This duty is sufficiently broad, however, to encompass the risk that employees who have not been trained in safe methods of performing dangerous work may be hurt. Further, the town is liable for the negligence of its employee, Dailey, under a theory of respondeat superior. As the driver of the truck, as well as the person in charge of the pole setting operation, Dailey had a duty to Sloan which encompassed the risk that Sloan would be injured by the improperly fastened log.
The trial judge found that the defendants breached their duties to Sloan. This is a factual finding and will not be disturbed in the absence of manifest error. See Theriot v. Lasseigne, 93-2661 (La. 7/5/94); 640 So.2d 1305 and Blair v. Tynes, 621 So.2d 591 (La. 1993).
The testimony of the mayor of Vinton, Charles Coppels, was that the town's safety manual did not deal with the proper methods to be used in installing utility poles. The testimony is uncontradicted that Sloan was an inside electrician, unfamiliar with the methods and routines of installing utility poles. Raymond Guillory was the town's superintendent in charge of electrical work at the time of the accident. He testified that Sloan was not given any training or safety instruction on being assigned to the electrical department. Curtis Edgar was the Assistant Superintendent at the time of the accident. He, too, stated that Sloan received no training for the work he was to do. He testified that it was common for the second person on pole installations to ride in the back of the truck between sites. Dailey himself admitted that it was common practice to ride in the back of the truck, though not in the position Sloan took. It is uncontested that the pole remaining on the truck was not secured after the first pole was removed. Edgar testified that poles can be secured so that they do not roll by tying the winch line around them. He indicated that the proper procedure is to secure poles remaining on the truck before moving the truck. Given these facts, we find no error in the trial judge's finding that the defendants breached their duties to the plaintiff. Accordingly, we find no error in the determination that the defendants should be assessed with fault in the accident.

COMPARATIVE FAULT OF THE PLAINTIFF
Sloan argues that he should not have been found comparatively at fault in the accident.
*798 Sloan, as the trial judge correctly noted, had the duty of doing what a reasonable man would do under like circumstances for his own safety and protection. Crooks v. National Union Fire Ins. Co., 620 So.2d 421 (La.App. 3 Cir.), writ denied, 629 So.2d 391, 392 (La.1993) Jones v. Trailor, 93-2144 (La. App. 4 Cir. 4/28/94); 636 So.2d 1112, writ denied, 94-1337 (La. 9/16/94); 642 So.2d 193. We can find no error in the finding that by putting himself in the path of the unsecured pole, the plaintiff did not act as a reasonable man. Further, this failure to act as a reasonable man was a substantial factor in the occurrence of the accident. Consequently, we find no error in the trial judge's determination that Sloan was comparatively at fault.

APPORTIONMENT OF FAULT
Both plaintiff and defendants argue that fault was incorrectly apportioned in this case. Apportionment of fault is a factual matter. The trial court's findings in this regard should not be disturbed on appeal unless they are clearly wrong or manifestly erroneous. Baugh v. Redmond, 565 So.2d 953 (La.App. 2 Cir.1990); Central La. Electric Company v. Cox Construction Co., Inc., 471 So.2d 1117 (La.App. 3 Cir.1985).
The Louisiana Supreme Court, in the case of Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La. 1985), gave us guidelines to assist in the determination of percentages of fault.
... in assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including, (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Id. at 974.
The trial judge apportioned fault 20% to Sloan, 50% to Dailey and 30% to the town. After reviewing the record in light of the Watson guidelines, we can find no manifest error. Sloan, while negligent, was unfamiliar with the situation. Further, he may have been hesitant to voice objections, given the fact that his continued freedom depended on his performance. We cannot say that the trial judge erred in apportioning the major part of the fault to Dailey, especially in light of his failure to resecure the pole before driving away in violation of the normal routine. Therefore, we will not disturb the trial court's apportionment of fault.

DAMAGES
General Damage Award
Sloan, in his answer to the appeal, contends that the trial court's award of $15,000.00 for past present and future pain and suffering, disability, mental anguish and of an additional $15,000 for loss of enjoyment of life was inadequate. The supreme court in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) explained the appropriate standard of review applicable to general damage awards:
In Reck v. Stevens, 373 So.2d 498 (La. 1979), this Court commented on appellate review of general damage awards and on the "much discretion" in fixing damages accorded to trial courts by La.Civ.Code art. 1934(3) (1870). The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular *799 effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. [Footnote omitted.]
Id. at 1260-61.
The defendants argue that the trial judge erred in relying on lay testimony over expert testimony in assessing damages. We can find no authority, and the defendants have not cited any authority, for the proposition that a trial judge may not give weight to lay testimony in assessing a general damage award. Further, the record reflects that the trial judge considered all the testimony in coming to the award, but accepted the testimony of Dr. Bernauer as a correct assessment of the plaintiff's condition. The trial judge, in his written reasons for the award of damages, correctly outlined the medical testimony concerning Sloan's condition, as follows:
Dr. DeWitz, a general practitioner, saw plaintiff the day of the accident and recorded his initial complaints regarding the left hand. He [Sloan] was told to elevate the hand and to use ice and to return if not better in one or two days. On September 15, 1992, plaintiff returned to Dr. DeWitz, complaining that he still had pain in his third and fourth fingers and was unable to make a tight fist. Dr. DeWitz arranged a referral to Dr. Cohen, an orthopedic surgeon.
Dr. Cohen saw plaintiff on September 30, 1992, and recorded complaints on flexion beyond 50% of the third and fourth fingers, and made an initial diagnosis of soft tissue sprain of the left hand. He saw plaintiff again on October 14, 1992, and the last time on November 4, 1992, at which time he recorded that the plaintiff was doing extremely well and that he had only a limitation of a final few degrees on hyperflexion of his long and ring fingers and into the palm. He was released as having no permanent injury.
Plaintiff was not satisfied with his condition upon release by Dr. Cohen, and through his attorney, learned that Dr. Dale Bernauer was a hand specialist, resulting in plaintiff seeking the assistance of Dr. Bernauer, also an orthopedic surgeon.
Dr. Bernauer first saw plaintiff December 16, 1992, when he complained of not *800 being able to make a full fist and continued pain in the left hand. A thermogram taken by Dr. Bernauer showed increased heat in the left hand, which indicated inflammatory process and was some evidence of reflex sympathetic dystrophy referred to by abbreviation as RSD.
Dr. Bernauer referred plaintiff to Dr. Cassingham, whose operative report is in evidence as Exhibit P-2 as part of medical records from Lake Area Medical Center which were also considered by the court.
Dr. Bernauer explained that RSD is a misfunctioning of the sympathetic nerves. These are the nerves that innervate the blood vessels and cause the blood vessels to shrink and swell according to stimuli. With RSD, the nerves mis-function and hands become swollen and sometimes cooler and sometimes hotter or sweatyall sympathetics.
Dr. Bernauer explained that the Bier Block is a procedure which involves emptying the veins in the subject area and then injecting the veins with lidocaine and sulocortef to calm the nerves. Dr. Cassingham did the Bier Block on March 12, 1993.
Thereafter, Dr. Bernauer saw the plaintiff on May 21, 1993, and found him to still be complaining of numbness to the third and fourth ring fingers and did not see him again until he returned on November 2, 1994. On this occasion, plaintiff complained that he could not get a good grip on his guitar. Dr. Bernauer found the left hand cooler than the right hand, and that plaintiff had 50 pounds of grip strength in his right hand but only 30 pounds in the left.
Dr. Bernauer's final conclusion was that plaintiff had some symptoms of RSD, but they were mild to moderate and he was able to work with the hand. RSD is permanent, but can flare up or occur with another injury. Dr. Bernauer assigns plaintiff with a 10% disability of the left hand, which he states would be a 3% disability of the arm and 2% disability of the body.
Dr. Cohen, on the other hand, did not find any permanent disability, and noted that it is possible for RSD to be confused with peripheral neuritis, which is caused by alcoholism. Dr. Cohen actually expressed no opinion on this with respect to plaintiff, and stated that he would defer to a neurologist. He also stated that he did not use thermograms in his practice, and would not comment on their use.
Because of the conflict in medical testimony, the trial judge also considered the lay testimony of two of Sloan's friends as to his condition. Additionally, he reviewed the plaintiff's testimony:
The witness McElyea worked with plaintiff before and after the accident. The witness Wiesjahn lived with plaintiff for a time both before and after the accident. Both of these witnesses testified that since the accident, plaintiff needed help with "some things" both in the work environment and around the house. Mr. Wiesjahn noted that after the accident he had to sweep up things plaintiff dropped and he had to take over the cooking. Both witnesses testified to plaintiff's complaints about his left hand, and noted that he had not played the guitar since the accident and complained about not playing. With respect to plaintiff's guitar playing, Mr. McElyea noted that "he loved it" and also that Mr. McElyea liked to sing. In all cases, plaintiff played only for his own and his friends' amusement, as there was no evidence that he played for the public or for compensation.
In fact, it is the court's impression from plaintiff's testimony that he had more concern about his loss of guitar playing ability than he did as to the impact of his injury on work.
He said he was "not having a whole lot of trouble with the hand unless working hard with it or straining it." In fact, plaintiff's work limitation more seems to stem from the fact that he wants to retain his semi-retired status, and must report to his union pension fund if he works over a certain number of hours. Since his accident, he worked from June, 1993, through May, 1994, for several contractors on an expansion of an airport in Colorado and again for an expansion of a plant which made computer chips. His grip is not as *801 strong, although the left hand does not hurt all of the time.
The trial judge concluded that Dr. Bernauer was Sloan's treating physician. He adopted Dr. Bernauer's conclusion that the plaintiff received a dorsi-flexion injury of the left hand which has left him with a 10% permanent partial disability of that hand. He concluded that the injury prevents Sloan from playing the guitar and hinders his work.
Our analysis of the facts of this case reveals no abuse of discretion in the award of general damages. Accordingly, we will not disturb the award.

Lost Earning Capacity
The defendants argue that the record does not support an award for loss of earning capacity. They allege that the award is not appropriate because there has been no proof that Sloan lost income as a result of the accident. However, an award of loss of earning capacity need not be based on any actual loss of income. Nor is the fact that Sloan was semi-retired both before and after the accident an indication that an award is not due for loss of capacity. This court in Batiste v. New Hampshire Ins. Co., 94-1467 (La.App. 3 Cir. 5/3/95); 657 So.2d 168, writ denied, 660 So.2d 472 (La.), explained the basis for an award of loss of earning capacity, as follows:
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344 (La.1990).
In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition. Finnie v. Vallee, 620 So.2d 897 (La.App. 4 Cir.), writ denied 625 So.2d 1040 (La.1993).
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident. Finnie, 620 So.2d at 901. [Emphasis added.]
Id. at 170.
The trial judge found that Sloan's loss of functional ability entitled him to an award for loss of earning capacity. The record, especially the testimony of the plaintiff and his co-worker, McElyea, supports the conclusion that Sloan's residual disability will disadvantage him in the work force. As a result, we find no error in the trial judge's determination that Sloan was entitled to an award of loss of earning capacity.
Medical Expenses
Finally, the plaintiff argues that the trial judge made a clerical error in adding the bills of Dr. Dale Bernauer, and so made an inadequate award of medical expenses. The trial judge in his written reasons indicates that the medical bills entered in evidence establish that Dr. Dale Bernauer provided services in the amount of $430.00. Our review of the record shows that, as plaintiff alleges, Dr. Bernauer submitted bills in the amount of $560. Accordingly, the judgment of the trial court will be amended to show an increase of $130.00 in the award of medical expenses from $2916.32 to $3046.32.

*802 CONCLUSION
The trial court's award of medical expenses is amended to reflect and award of $3046.32. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are to be paid by the defendants, the Town of Vinton and Trennion T. Dailey.
AFFIRMED AS AMENDED.