l iGREMILLION, Judge.
The defendant, the State of Louisiana, Department of Transportation and Development (DOTD), appeals a judgment by the trial court finding it 10% at fault in causing the plaintiff, Floyd Graves, damages resulting from a two vehicle accident on Louisiana Highway 117, and holding DOTD 50% in solido with the driver of the other vehicle, Leslie Leon Page (who was found 90% at fault), for the $1,319,161.33 in damages awarded to Graves. After reviewing the record, we find no manifest error in the trial court’s decision and affirm.
FACTS
At approximately 5:50 p.m., September 7, 1991, Graves was driving his 1989 Ford pickup truck north on Louisiana Highway 117. Graves was on his way from Provencal to Robeline to watch his son play in the championship round of a charity softball tournament. A light rain was falling, making the asphalt surface ofjjthe roadway dangerously slick. At the same time, two Natchitoches Parish Sheriffs officers were pursuing Page south on Louisiana Highway 117 towards Provencal. Narcotics Detective Greg Dunn was approximately one to two car lengths behind Page and Civil Defense Deputy Shelby Borders was about the same distance behind Detective Dunn. Both officers had activated their sirens and emergency flashing lights before turning off of Louisiana Highway 6 onto Louisiana Highway 117. Detective Dunn stated that on several occasions, while following Page, he moved his vehicle to the left in an attempt to attract Page’s attention and encourage him to pull over. Both officers stated that Page ignored the lights and sirens throughout their pursuit.
As the three cars approached the Howard Hall curve where the accident took place, Detective Dunn estimated Page’s speed at 65 to 70 nadies per hour. The curve had a posted advisory speed of 35 miles per hour. Both officers testified that Page’s vehicle was swerving back and forth on the highway and that moments before the accident Page almost hit a bridge railing. Detective Dunn testified that, as they approached the curve, he “backed off’ allowing the distance between his vehicle and Page’s to widen to three or four car lengths. He stated that as Page entered the curve, his vehicle’s right wheels, both front and rear, drifted off the surface of the road and onto the shoulder. Detective Dunn recounted that as Page attempted to regain the road’s surface, he apparently over corrected and lost control of his vehicle. Page’s vehicle started to travel toward the northbound shoulder of the highway and, at the same time, began a counterclockwise spinning motion. According to Detective Dunn, he observed the collision between the Page and Graves vehicles seconds later. Detective Dunn stated that the impact took place in Graves’ lane of travel, but the momentum of the impact carried both vehicles onto and across the northbound jyjshoulder of the highway.
After the accident, it was determined that Page had a blood alcohol level of 0.29%, almost three times the level of 0.10% at which one is considered guilty of operating a vehicle while intoxicated under La.R.S. 14:98. Detective Dunn, the only disinterested party to actually witness the accident, opined that the accident was caused by Page’s drunkenness, his excessive speed, and the slippery condition of the road. Detective Dunn fur *1064 ther testified that when he first observed Graves’ vehicle it was proceeding north in its proper lane of travel. He stated that Page had already lost control of his vehicle at that time and that the impact between the two vehicles occurred almost immediately thereafter.
Graves testified that he first heard the siren as he approached the three curves in Louisiana Highway 117. He had already started to brake for the curves, slowing down to about 40 miles per hour, so he took no further action to adjust his speed. In an attempt to locate the source of the siren, and since he saw nothing coming towards him due to the brush growing inside the curve, Graves looked in his rearview mirror. He saw nothing. When he returned his vision to the front, he immediately saw a brown vehicle, 70 to 80 feet away, coming directly towards him. The vehicle was still in its lane of travel, but was pointed towards him as it spun out of control. When he saw the vehicle coming towards him, Graves jerked his truck to the right, however, the impact occurred in his lane of travel. Graves testified that from the time he saw Page’s vehicle until the point of impact, 1 to 1½ seconds passed. He further stated that had the brush been cleared inside the curve, he would have had a better view of the highway ahead of him and would have seen Page’s vehicle sooner.
HTrooper Stephen Rachal was one of two investigating officers for the Louisiana State Police (the other trooper did not testify). Trooper Rachal stated that tire marks on the shoulder of the southbound lane indicated that just prior to the accident approximately one-half of Page’s vehicle left the roadway, traveled for a short distance on the shoulder, and then came back “onto the road and went across into the northbound lane” where the collision occurred. Further, Trooper Rachal testified that Graves’ vehicle traveled about 25 feet after it was struck by Page’s vehicle. The truck continued its northward direction of travel, but due to the force of the collision and Graves’ attempted evasive action, it veered to its right, penetrated some brush and small trees, and came to rest against the bottom of the embankment on the right hand side of the northbound lane of travel. Trooper Rachal indicated that he could find no skid marks at the scene. He stated that the estimated 65 to 70 miles per hour listed in his report, the speed of Page’s vehicle at impact, was based upon figures provided by the pursuing officers.
LAW
A court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State Through DOTD, 617 So.2d 880 (La.1993). The appellate court must determine not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one, after reviewing the record in its entirety. Mart v. Hill, 505 So.2d 1120 (La.1987). “The reviewing court must give great weight to the factual conclusions of the trier of fact; where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). This standard of review also applies to credibility determinations of expert witnesses. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990); Richard v. Dupuis, 94-215 (La.App. 3 Cir. 11/23/94), 649 So.2d 718, writ denied, 94-3009 (La. 2/9/95), 650 So.2d 245.
In its reasons for judgment, the trial court set out the theory of the case as follows:
It is the contention of the plaintiff that had the brush been cleared in that eastern ditch, which was on his right, he would have been able to see farther around this right hand curve and would have had more time to have taken evasive action to have avoided the oncoming Page vehicle. It is the contention of the defense that the existence of a high ditch bank would have limited the plaintiffs view regardless of whether or not the trees and brush were cleared. Additionally, the defense contends that the plaintiff was not watching the road in front of him and therefore *1065 would not have seen the oncoming vehicle even if the brush were (sic) cleared.
DOTD’s liability in cases such as the one at bar was recently reviewed by our supreme court in Campbell v. Department of Transportation & Development, 94-1052, p. 5 (La. 1/17/95), 648 So.2d 898, 901, wherein the court stated:
DOTD’s liability may arise under a theory of negligence, La.Civ.Code art. 2315, or a theory of strict liability, La.Civ.Code art. 2317. The distinction between recovery under these theories is that under strict liability, the plaintiff is relieved of proving the owner or custodian of the thing which caused the damage knew or should have known of the risk involved. See Kent v. Gulf States Utilities Co., 418 So.2d 493, 497 (La.1982). Nevertheless, La.R.S. 9:2800 as applied to government defendants requires a plaintiff to prove that the public entity has “actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.” Therefore, under either theory the analysis is the same.
In determining whether liability exists under a duty-risk analysis, a plaintiff must prove that the conduct in question was the cause-in-fact of a resulting harm that defendant owed a duty to plaintiff which defendant breached and that the risk of harm was within the scope of protection afforded by the duty breached. Mundy v. Dept. of Health and Human Resources, 620 So.2d 811 (La.1983). The duty of the state through DOTD is to keep the highways and its shoulders in a reasonably safe condition. Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1172 (La.1986). This duty encompasses the obligation to protect a motorist who inadvertently drives onto the shoulder of the highway. Rue v. State, Dept. of Highways, 372 So.2d 1197, 1199 (La.1979). Whether DOTD breached its duty, that is, whether the roadway at the scene of the accident was in an unreasonably dangerous condition, will depend on the facts and circumstances of each ease. Hunter v. Dept. of Transp. and Dev., 620 So.2d 1149 (La.1993).
Graves claims, and the trial court found, liability on the part of the DOTD based upon vegetation growing within the highway right of way obscuring Graves’ view of oncoming traffic, and thus, shortening the time available for him to react to Page’s oncoming vehicle. In order to find DOTD at fault in causing this accident one must use a duty-risk analysis. This analysis was discussed in Sloan v. Dailey, et al, 95-906 (La.App. 3 Cir. 12/6/95), 664 So.2d 792, wherein this court stated:
To determine whether the defendants are liable, we will apply a duty-risk analysis, by asking:
1) Was the act or omission complained of a cause-in-fact of the harm?
2) Did the defendant owe a duty to protect this plaintiff from this type of harm arising in this manner?
3) Did the defendant violate the duty?
Therefore, we must consider whether the conduct of the defendants was a cause-in-fact of the injury to Sloan.
An act of (sic) [or] omission is considered to be a cause-in-fact of harm to another if it was a “substantial factor” in bringing about the accident. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970); Lejeune [Lejeune] v. Allstate Ins. Co., 365 So.2d 471 (La.1978). Restatement of Torts 2, Sections 431-33 (1965). As noted in the restatement, factors which may be considered in determining whether the actor’s negligence is a substantial factor include “whether the actor’s conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm ...”
The “substantial factor” test is akin to the ‘but for’ test (i.e. the accident would not have happened but for the defendant’s negligence), except that where more than one party’s negligence 17would have caused the accident absent the other party’s negligence, Dixie, su *1066 pra, and Lejeune [LeJeune ], supra, hold both to be causative.
As succinctly stated by the Louisiana Supreme Court, in LeJeune [Lejeune], supra:
“As Prosser [on Torts, Section 41 at pp. 237-38 (4th Ed.1971)] notes, the ‘but for’ test (that the accident would not have happened but for the defendant’s negligence), while it explains the greater number of cases, does not serve as an adequate test for the present situation: ‘If two causes occur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result, some other test is needed ...’ In such cases it is quite clear that each cause has in fact played so important a role in producing the result that responsibility should be imposed upon it; and it is equally clear that neither can be absolved from that responsibility upon the ground that the identical harm would have occurred without it, or there would be no liability at all. Id., p. 239”
Trahan v. State, Department of Transportation and Development, 536 So.2d 1269, 1272 (La.App. 3rd Cir.1988), writ denied, 541 So.2d 854 (La.1989).
Id. at 796.
In the ease sub judice, two experts testified, one each for Graves and the state. Gene Moody, testifying for Graves, was accepted as an expert in motor vehicle accident reconstruction, safety engineer, road design, construction, and maintenance. In reconstructing the accident, Moody stated that Page’s intoxication caused him to run off onto the shoulder of the road, after which he over corrected by steering sharply to the left and lost control of his vehicle. Page’s vehicle began to yaw, moving forward and sideways at the same time, across the road at a sharp angle and impacted with Graves’ truck in the northbound lane of travel. The impact stopped Page’s vehicle and knocked it backwards fifteen feet, while Graves’ truck continued northward for another twenty-five feet, coming to rest against two pine trees located in the ditch and on the slope of the embankment. In calculating the speed of the two | gvehicles, Moody assumed that Page was traveling 60 miles per hour when he entered the curve and then 55 miles per hour as he yawed across the road. As a result, he determined that Graves was traveling at 47.5 miles per hour.
Based on the location of Graves’ truck at the point of impact, Moody concluded that Graves had no time to take evasive actions prior to the collision. The normal amount of time for perception and reaction is 1 second. Moody allowed Graves another ½ second because he looked in his rearview mirror to find the source of the siren. Based on the testimony, he was unable to determine what Graves’ perception and reaction time was, but concluded there was insufficient time for him to perceive and react and then to try to avoid the collision.
Moody testified that had the vegetation in the ditch been cut back, Graves would have seen Page’s approaching vehicle quicker and had a better chance to avoid the accident. He stated that Graves’ decision and stopping sight distances were reduced by 15 to 20 feet due to the brush and pine trees growing inside the curve. DOTD’s failure to remove this vegetation violated the clear zone rule for maintenance. A highway posted for 35 miles per hour should have a clear zone of 12 to 14 feet. A clear zone is an area for drivers to run off the road and have a chance to recover without hitting any obstacles. The vegetation in this curve grew an average of six feet from the edge of the road’s surface. Moody further testified that after DOTD repaved Louisiana Highway 117 in 1990 and 1991 and put super elevation in, the road should have actually been posted for 40 miles per hour instead of 35 miles per hour. He stated that the posted speed was misleading because drivers familiar with the curve would instinctively realize that they could negotiate the curve at faster than 35 miles per hour.
RDr. Joseph Blaschke was accepted as an expert for DOTD in traffic engineering, highway design, and accident reconstruction. He testified that DOTD’s failure to eut the vegetation inside the curve did not render the curve unreasonably dangerous, nor did it *1067 contribute to the cause of this accident. Instead, the accident was caused by the intoxicated driver, Page, traveling the curve at a high rate of speed and failing to maintain control of his vehicle such that it crossed the center line and struck Graves’ truck.
Dr. Blaschke opined that Graves’ failure to look ahead may have slightly contributed to the accident because regardless of the vegetation, his sight distance to actually see Page’s vehicle before impact was 2.1 to 2.2 seconds. If Graves first heard the siren five seconds before impact and saw Page’s vehicle 1 to 1½ seconds before impact, then for 3 to 3½ seconds he was looking in his rearview mirror trying to locate the source of the siren. Dr. Blaschke testified that even if Graves had been looking ahead, he would not have avoided the accident since he would have had only an extra ½ second to slow down. At the most, this may have only resulted in a lesser impact speed. In addition, clearing out the embankment would have only given Graves an additional .10 or .20 of a second of sight distance, or fourteen feet, to locate Page’s vehicle. Because the curve and the configuration of the sight distance changed so rapidly in such a short distance, Dr. Blaschke testified that this extra .20 second would have made no difference in the outcome of the accident.
Dr. Blaschke further stated that the stopping sight distance on Louisiana Highway 117, which has a 4% grade, is 250 to 275 feet. When Graves first heard the siren, he was on the straight stretch of the road, five seconds from impact. At that point he could see between 200 to 500 feet down the road, well within the recommended stopping sight distance. When Graves returned his view towards the | ipfront, Page’s vehicle was already within this distance. Thus, DOTD did not violate the stopping sight distance for this road.
According to Dr. Blaschke, the real problem with the Howard Hall curve is the embankment and not the vegetation. But, he said there was no justification for DOTD to either cut back the embankment or realign the curve. There is no federal mandate requiring DOTD to do so. Instead, each state has its own policy and procedures, which basically only requires the state to maintain a roadway in a reasonably safe condition.
In finding that the Howard Hall curve was a cause-in-fact of this accident, the trial court, acknowledging the experts, stated:
However, in this case, all that expertise was unnecessary; one does not need a Ph.D in engineering to know that you can’t see as far around a right hand curve if the right hand ditch is full of trees and underbrush as you would be able to if it weren’t.
In holding DOTD liable under a theory of strict liability, the trial court found that: (1) that DOTD had custody of the highway shoulders and right of ways; (2) the “road ditch was defective in that the existence of trees and brush created an unreasonable risk of harm to others by substantially limiting view (sic) at this dangerous hilly curve;” (3) DOTD had knowledge of this condition since its supervisors testified that they regularly examined all DOTD roads within Natchitoch-es Parish; and (4) the vegetation growing within the curve was a cause-in-fact of the accident. After reviewing the record, we find that the judgment of the trial court, finding DOTD’s failure to safely maintain the shoulder of the Howard Hall curve was a cause-in-fact of the accident at issue, and as a result it was strictly liable to Graves, is reasonable and not manifestly erroneous in light of the conflicting testimony by the two experts. While a contrary finding by the trial court could have been held to be reasonable and free of manifest error, the record does not clearly show that its ruling was wrong. | nThis court is, therefore, prohibited from substituting its own judgment where the judgment of the trial court is reasonable and not clearly wrong. Thus, the trial court’s judgment finding DOTD 10% at fault is affirmed. DOTD’s assignments of error are dismissed.
DAMAGES
Although not specified as an error, DOTD alleges that the trial court abused its discretion in awarding general damages of $750,-000.00 and lost wages of $369,923.00 to Graves.
*1068 GENERAL DAMAGES
DOTD alleges that the record does not support an award for all of the injuries suffered by Graves. It further alleges that for those injuries which were proven, the trial court’s award was so high as to constitute an abuse of discretion.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), the court stated:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck [v. Stevens, 373 So.2d 498 (La.1979)] to the present case is that the discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
In awarding general damages of $750,000, the trial court stated:
[T]he court again notes that this was a violent head-on collision between two vehicles, both of which were moving at 50 to 60 miles per horn*. Mr. Graves received life threatening injuries, was in severe pain during his period of hospitalization and continues in constant pain to a | ^lesser degree even today due to his foot injury. He suffered and continues to suffer and will in all probability always suffer from disabling mental depression and anxiety. This has been in large part due to his transformation from an active, employed, physically fit man to one who is afflicted with a number of severe physical impairments. Mr. Graves was an experienced welder who had a long history of lucrative “union scale” wages and he knows he will never be able to return to that trade. Among the permanent disabilities he has been left with are 1) a permanent major vision impairment in the left eye, 2) a total hearing loss in the left ear, 3) permanent weakness in the left arm, 4) kidney dis-function, 5) mental depression with anxiety attacks, 6) an incessant pain in the right foot, which a recommended $14,000 surgery probably will, but may not alleviate. In addition, and of major significance, he has lost both his sense of taste and his sense of smell. In order to function he must ingest $130.00 worth of prescription medications each month.
As a result of the collision, Graves suffered numerous fractures to his head and face: basal skull fracture, a linear anterior skull fracture, fracture of the superior rim, lateral wall, medial wall, and inferior wall of the left orbit, fracture of the anterior and lateral walls of the left maxillary sinus, and a fracture of the left greater sphenoid wing. Graves also suffered a small left frontal epidural hematoma to his brain. As a result of the basal skull fracture, Graves lost all hearing in his left ear, complained of anosmia, or a lost sense of smell, and a lost sense of taste, all of which are permanent. He also suffered a deviated septum which has never been surgically repaired.
Other fractures suffered by Graves were to the right calcaneus or heel and the left ulna or small bone in the forearm. The fracture to the calcaneus has resulted in a 25% permanent loss of function to Graves’ right leg and causes him pain on a daily basis and swelling with standing and walking. Graves suffers from posttraumatic arthritis as a result of this injury and will probably require surgical stabilization or fusion of the subtalar joint, which will relieve the pain but will not change the permanent loss of function.
| ^Following his release from the hospital, Graves complained of a loss of vision in his left eye as a result of the accident. Prior to the accident, the vision in his left eye was *1069 correctable to 20/20. He was examined by several doctors after the accident. Dr. Randall Keator, who had examined Graves prior to his accident, testified that the vision in Graves’ left eye was 20/50 with or without correction and that this was a significant change from his previous vision. Dr. Bruce Wallace testified that the vision in Graves’ left eye was either 20/60 or 20/70. Although this is not considered legally blind, the vision in the left eye would be insufficient to pass a driver’s license test and may affect Graves’ depth perception. Dr. Wallace referred Graves to Dr. Stephen Breaud, a retinal specialist, who determined that the acuity in Graves’ left eye was 20/100.
Graves was seen by Dr. James Quillian for a neurophsyehologic examination on two different occasions, as a result of depression. His first examination occurred in March 1992, several months after the accident. At that time, Dr. Quillian stated that “[t]here appear to be a number of probable emotional changes involving depression, anger, impul-sivity, and possibly some periods of confusion, though clinically he shows no evidence of psychosis.” Dr. Quillian recommended that anti-depressive therapy be considered along with a psychologic follow-up to help Graves adjust during his recovery. Dr. Quil-lian next saw Graves on June 27, 1994. At that time, Dr. Quillian noted that the “MMPI results remain significantly abnormal. However, the validity of his profile is questionable. Findings can not rule out some very significant agitation, depression and perhaps even paranoid features. His psychologic condition has clearly not improved, and in fact, may have deteriorated somewhat since last seen.”
114Pr. Quillian’s impression was that Graves’ psychologic condition was worsening despite the fact that objective studies tended to show that his overall neuropsychologic status was improving. Dr. Quillian recommended that Graves see his family doctor to discuss the possibility of him resuming anti-depressive therapy. Dr. C.E. Cook, Graves’ family physician, testified that following this evaluation, he placed Graves on Zoloft, an anti-depressant, and Xanax, a central nervous system depressant. '
Dr. Paul Ware performed a psychiatric evaluation on Graves. He determined that Graves had an adjustment disorder of adulthood with depressed mood secondary to his accident of September 7, 1991. Dr. Ware recommended that Graves enter therapy and be placed on anti-depressive medication. He felt that Graves would have a favorable response once this occurred.
Graves was twice admitted to the V.A. Medical Center in Alexandria. He was admitted first on September 2, 1992, his chief complaint being depression. The report states that Graves had a two month history of mood swings and anger, which caused him to drink. Dr. Peter Barrenechea examined Graves; his impression was that Graves had an adjustment disorder with depressed mood, possible alcohol dependency, and chronic headache secondary to motor vehicle accident.
Graves was again admitted to the V.A. Medical Center on October 9,1998, pursuant to a coroner’s emergency certificate issued by Dr. Cook. This was due to Graves drinking whiskey while taking pain pills for severe shoulder pain. During the course of his stay, Graves was given folic acid, vitamins, and thiamine. After a psychiatric consult determined that he was not suicidal, Graves was discharged on October 13,1993.
|15On November 11, 1991, Graves saw Dr. Cook, because of trouble he was having urinating. Dr. Cook thought the problem resulted from Graves having to wear a catheter over a long period of time. He explained that Graves had a very small opening to the external urethra. Dr. Cook referred Graves to Dr. Milton Eichman, a urologist. Graves was seen by him on November 21,1991. Dr. Eichman stated that he thought Graves was suffering from a urethral stricture or some form of urethral obstruction due to a decrease of the caliber of his stream. Dr. Eichman suggested a retrograde urethro-gram, a cystoscopy to evaluate Graves’ urethral prostate and bladder neck for his voiding difficulties. Dr. Eichman suggested that there was some possibility that Graves’ problem was the result of either his catheterization or from trauma related to his accident. *1070 During the trial, Graves testified that he was still having difficulty urinating.
Considering the effects of the various injuries suffered by Graves as the result of the head-on collision, we find that the $750,000.00 awarded for general damages is not beyond that what a reasonable trier of fact might have awarded. Youn, 623 So.2d 1257. Because we find that the trial court has not abused its vast discretion in awarding this amount, DOTD’s assignment of error is dismissed and the trial court’s judgment is affirmed.
FUTURE LOST WAGES
DOTD alleges that the report by economist Dr. G. Randolph Rice, which the trial court based its award for future lost wages on, should be rejected because it was based upon facts not supported by the record. DOTD disagrees with the report because Dr. Rice based his calculation for future lost wages on Graves being unable to work. In his report, Dr. Rice figured that Graves’ average annual earnings, based upon his tax records, equaled $31,363.24 and his future work-life | ^expectancy from the date of the trial was 14.66 years. Dr. Rice determined that based upon these two figures, the discounted/present value of Graves’ future earnings was $369,923.00.
DOTD would prefer this court to consider a report by economist Dr. M.N. Trapani, which provided two alternatives for Graves’ future lost wages. These alternatives were based upon a report by vocational rehabilitation specialist, Dr. Diana Herbst, who stated in a hypothetical scenario that Graves could consider becoming employed at either minimum wage or as a welding instructor. Dr. Trapani determined that Graves’ 1994 base earning would have been $26,905.41 per year and his work-life expectancy was 14.7 years. In determining the future lost wages, Dr. Trapani offset Graves’ future prospective earnings by a minimum wage earning capacity of $4.25 per hour under the first alternative and a salary of $24,000.00 per year under the second alternative. The future lost wages under the minimum wage alternative was $173,691.46 and $33,354.00 under the welding instructor alternative.
In Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976), the court stated:
We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award, [citations- omitted]. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court, [citations omitted].
After reviewing the record, we can not say that the trial court abused its discretion in awarding Graves $369,923.00 for lost wages. As the trier of fact, the trial court was in the best position to weigh the conflicting evidence with regards to the reports by the two economist, plus it observed Graves and heard all the evidence with regards to whether he could return to work. Dr. Herbst testified that she based li7her report on the medical reports of the treating physicians, however, she stated that she did not review any of the doctors’ depositions taken prior to trial. The award of future lost wages is affirmed and DOTD’s assignment of error is dismissed.
CONCLUSION
For the foregoing reasons, the judgment of the trial court finding DOTD 10% at fault in causing the accident which resulted in Floyd Graves’ damages, and holding it 50% in soli-do with the driver of the other car, is affirmed. The trial court’s awards of $750,-000.00 in general damages and $369,923.00 in future lost wages are also affirmed. The costs of this matter, $17,694.85, are assessed against the defendant, the State of Louisiana, Department of Transportation and Development.
AFFIRMED.
DOUCET, C.J., dissents with reasons.
SULLIVAN, J., dissents for reasons assigned by DOUCET, C.J.