752 So.2d 221 (1999)
Sharon SEVARIO, et al.
v.
STATE of Louisiana, through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT
No. 98 CA 1302.
Court of Appeal of Louisiana, First Circuit.
November 10, 1999.
Rehearing Denied December 30, 1999.
Writ Denied April 7, 2000.
*225 Gary M. Gaudin, George Waguespack, Gonzales, for Plaintiffs-Appellees, Sharon Sevario, et al.
Keith C. Armstrong, Henry D. Salassi, Jr., Baton Rouge, for Defendant-Appellant, State of Louisiana, Through The Department of Transportation and Development.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
GUIDRY, J.
This matter comes to us on appeal of a personal injury matter arising from a vehicular accident. Appellant, Department of Transportation and Development ("DOTD"), alleges that several trial court rulings, as well as the trial court's judgment and damage award in favor of Sharon Sevario and Thomas Sevario, appellees, based upon the jury verdict in this case, are erroneous. After a de novo review of the case, we reverse and render in part and affirm in part.

FACTS AND PROCEDURAL HISTORY
On July 29, 1995, a vehicle driven by Mrs. Sevario was struck in a collision occurring at the intersection of Louisiana Highways 44 and 42, in Ascension Parish. Mrs. Sevario had reached this intersection while traveling north on Highway 44. Upon reaching the intersection, Mrs. Sevario attempted to make a left turn and proceed west on Highway 42. While attempting this left turn, Mrs. Sevario's vehicle was struck on the driver's side by a vehicle driven by Kaye Lambert. As a result of the damage caused by this collision, emergency workers found it necessary to extricate Mrs. Sevario using the "jaws of life" to cut her out of her vehicle. Mrs. Sevario suffered several serious injuries as a result of this accident.
On November 21, 1995, appellees filed suit against the State of Louisiana, through the Department of Transportation and Development. Appellees alleged that the intersection of Highways 42 and 44 did not meet highway construction standards, was unsafe, and created an unreasonable risk of harm, which caused Mrs. Sevario's accident. Ms. Sevario sought damages based upon her injuries, lost wages, pain and suffering, and mental anguish. Mr. Sevario sought damages based upon a loss of consortium claim.
DOTD answered appellees, denying liability and naming Trinity Universal Insurance Company ("Trinity"), appellees' alleged uninsured motorist insurer, and Kaye Lambert as third-party defendants. Appellees amended their original petition, naming Trinity as an additional defendant in their suit.[1]
A jury trial was held October 14-17, 1997. The jury returned a verdict finding DOTD 100% liable. While the jury did find Ms. Sevario negligent, its response to a special interrogatory indicated that it did not find her negligence to be a substantial *226 factor causing this accident. The jury awarded damages to Ms. Sevario in the following amounts: 1) past medical expenses $115,000.00; 2) past lost wages $45,000.00; 3) future medical expenses $80,000.00; 4) future lost wages and loss of earning capacity; $200,000.00; 5) disfigurement $175,000.00; 6) past and future pain and suffering$700,000.00; 7) past and future mental anguish and distress $700,000.00. The jury awarded Mrs. Sevario a total of $2,015,000.00 in damages. The jury awarded Thomas Sevario $35,000.00 in damages on his loss of consortium claim.
On October 31, 1997, DOTD filed a motion for judgment notwithstanding the verdict (JNOV) and/or new trial. The trial court held a hearing on these motions on November 24, 1997, after which it rendered a judgment denying both motions.
DOTD has appealed the trial court's judgments of October 31, 1997, and December 17, 1997, alleging the following assignments of error:
1. The district court erred in denying DOTD's Motion to Continue and/or Motion to Strike Expert Witness Testimony where defendant timely objected to the prejudicial inclusion of expert witnesses shortly before trial.
2. The jury erred in concluding that the conditions existing at the intersection of La. Hwy 42 and 44, constituted an "unreasonable risk of harm," that DOTD had actual or constructive knowledge of the alleged condition and failed to remedy it in a reasonable time frame, and the conditions complained of were a proximate cause of the accident.
3. The jury erred in finding DOTD 100% at fault where it was determined that plaintiff was negligent but that her negligence was not a substantial cause of her own injuries.
4. The court erred in allowing the jury to reconsider a portion of jury verdict form once defect prejudicing defendant was noticed.
5. The jury erred in awarding damages of $2,015,000.00 to plaintiff.
6. The court erred in denying DOTD's Motion In Limine relative to the accident reports and further permitting plaintiffs' expert to testify regarding same.
7. The court erred in not granting defendant's Motion for JNOV and Motion for New Trial.

DISCUSSION

Motion to Continue and/or Motion to Strike
The trial court may grant a continuance on peremptory or discretionary grounds. La. C.C.P. arts. 1601, 1602. Where peremptory grounds exist, a trial court must grant a continuance. See La. C.C.P. art. 1602. There are only two such grounds1) a movant, despite due diligence, has been unable to obtain material evidence, and 2) a material witness is absent "without the contrivance of the party applying for the continuance." Id. The movant bears the burden of proving that a continuance motion falls within the peremptory grounds. Armstrong v. State Farm Fire and Casualty Company, 423 So.2d 79, 81 (La.App. 1st Cir.1982).
La. C.C.P. art. 1601 provides for a continuance "if there is good ground therefor." The trial judge must consider the particular facts of a case when deciding whether to grant or deny a continuance. Our Lady of the Lake Hospital v. Vanner, 95-0754, p. 3 (La.App. 1st Cir.3/27/97), 692 So.2d 40, 42, writ denied, 97-1567 (La.9/26/97), 701 So.2d 992. The trial court should consider the diligence and good faith of the movant and other reasonable grounds. Id. The trial judge may also weigh the condition of the court docket, fairness to the parties and other litigants before the court, and the need for *227 orderly and prompt administration of justice. Vanner, 95-0754 at 5, 692 So.2d at 42.
The trial court has great discretion in granting or denying a continuance under La. C.C.P. art. 1601. A trial court ruling should not be disturbed on appeal in the absence of a clear abuse of discretion. Sauce v. Bussell, 298 So.2d 832, 834 (La. 1974). While the trial court's discretion to grant or deny a continuance is not absolute, and may not be exercised arbitrarily, appellate courts only reluctantly interfere in such matters. Id.
In this case, DOTD has not alleged that there were peremptory grounds for granting a continuance. Thus, we must determine whether the trial court abused its discretion when it denied DOTD's motion to continue to allow examination of several of appellees' witnesses.
As noted above, the movant's due diligence is an important factor when considering the merits of a motion to continue. In this case, DOTD chose not to avail itself of available discovery tools. Thus, its lack of familiarity with several of appellees' witnesses, particularly the vocational rehabilitation specialist and the economist, was due to its own inaction. Such experts are common to most personal injury cases and had DOTD engaged in discovery, or appropriate pretrial preparation with its own experts in these fields, DOTD would not have been unprepared for the plaintiffs' experts.
Also, the record does not demonstrate, contrary to DOTD's argument, that Drs. Vincent and Davis, a clinical psychologist and neuro-psychologist respectively, were retained as "surprise" witnesses immediately prior to trial. Testimony indicated that the doctors' services were ultimately retained as a result of a referral made by Dr. Hall, Mrs. Sevario's primary care physician, during the course of his treatment of Mrs. Sevario. Mrs. Sevario first saw Dr. Vincent, who then referred her to Dr. Davis during the course of his treatment. As such, had DOTD conducted any discovery involving Dr. Hall, it could have uncovered. Dr. Hall's observations related to his concern for Mrs. Sevario's emotional stability after the accident.
We also note that DOTD was informed of each of these witnesses through appellees' timely submission of their pretrial inserts. Appellees also provided DOTD with copies of reports prepared by each of these witnesses. DOTD received these reports prior to trial and also at essentially the same time that appellants received these reports. The record clearly demonstrates that this allowed DOTD time to conduct an effective cross-examination of each of these witnesses.
In light of DOTD's lack of diligence during discovery, the fact that the discovery period had been extended once in this case, the additional delay a continuance would cause and the fact that DOTD was able to effectively cross-examine appellants' witnesses, we do not find any merit in this assignment of error.

23 U.S.C. § 409
The trial court erred in permitting the discovery of prior accident reports and testimony relative to and based upon those reports. The trial judge did so over objections of DOTD's defense counsel.
On May 19, 1997, DOTD filed a Motion to Quash and/or Motion for a protective Order relative to a Notice of Deposition of Donald Marson and a subpoena duces tecum served upon DOTD employee Marson that required DOTD to produce:
Any and all accident histories, accident reports and history filed for the intersection of La. Hwy. 42/44 in Ascension Parish with a milepost of 3.60-3.80 on 42 and milepost 0.00-2.00 on 44 for the years 1990-1995.
DOTD contended the documents were non-discoverable and inadmissible at trial pursuant to 23 U.S.C. § 409.
In 1987, Congress enacted 23 U.S.C. § 409 ("section 409") to preclude from discovery and evidence any report survey, schedule, list, or data collected or *228 compiled for developing any highway safety construction improvement project that may be implemented with federal funds. Section 409[2] provides:
Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying[,] evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossing, pursuant to sections 130, 144, and 152 of the title or for the purpose of developing any highway safety construction improvement project which may be implemented using Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.[3]
Section 409 is intended to "[f]oster the free flow of safety-related information by precluding the possibility that such information later would be admissible in civil suits. The interest to be served by such legislation is to obtain information with regard to the safety of roadways free from the fear of future tort actions." Reichert v. State, Department of Transportation and Development, 96-1419, 96-1460, p. 4 (La.5/20/97), 694 So.2d 193, 197.
Prior to its 1995 amendment, section 409 only excluded from discovery all compilations made for the purpose of identifying, evaluating, or planning highway safety construction and improvements. Thus, the Louisiana Supreme Court held that "[s]ection 409 creates a privilege for compilations enumerated in the statute, but the privilege does not extend to reports and [raw] data gathered for or incorporated into such compilations." Wiedeman v. Dixie Electric Membership Corporation, 627 So.2d 170, 173 (La.1993), cert. denied, sub nom. Louisiana Department of Transportation and Development v. Wiedeman, 511 U.S. 1127, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994). Accordingly, the supreme court precluded the following compilations from discovery and deemed them inadmissible:
1) surveys to identify hazardous railroad crossings and improve them ([23 U.S.C.] § 130);
2) applications for federal assistance in replacing or rehabilitating highway bridges ([23 U.S.C.] § 144);
3) studies assigning priorities and schedules of projects for highway improvement ([23 U.S.C.] § 152); and,
4) other compilations made for developing highway safety construction projects which would utilize Federal-aid funds ([23 U.S .C.] § 409).
Id. However, the supreme court deemed that accident reports, traffic counts, and other raw data collected by DOTD to produce these compilations were discoverable and admissible as evidence. Id.
In 1995, Congress amended section 409 to include the words "or collected" after "compiled." This amendment served to expand the scope of statutory immunity provided by section 409 to "any data compiled or collected in the furtherance of state highway safety projects which are either implemented with federal funds or *229 initiated pursuant to 23 U.S.C. §§ 130, 144, or 152." Palacios v. Louisiana and Delta Railroad, Inc., 98-258, pp. 5-6 (La.App. 3rd Cir.10/28/98), 721 So.2d 557, 560, rev'd, 98-2932 (La.7/2/99), 740 So.2d 95. Congress explained that:
It is intended that raw data compiled prior to being made part of any formal or bound report shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such data.
Act of November 18, 1995, Pub.L. No. 104-59, 1995 U.S.C.C.A.N. (109 Stat.) 568. This precluded the discovery and admission as evidence of any compilations as well as raw data, reports, or surveys collected for production of these compilations. Reichert, 96-1419, 96-1460 at 4-6, 694 So.2d at 197-99.
In Reichert, the supreme court determined that the 1995 amendment to section 409 provided statutory immunity to DOTD as to the discovery of all data that DOTD compiled or collected pursuant to section 409. The supreme court noted that "such information is collected or compiled to protect the public by ensuring that safety measures are routinely explored by DOTD without exposing their efforts." Reichert, 96-1419, 96-1460 at 6, 694 So.2d at 198.[4] Thus, the supreme court held that "section 409 bars discovery and introduction into evidence of all highway safety information collected or compiled by the State for the purpose of obtaining federal funds to enforce safety." Reichert, 96-1419, 96-1460 at 4, 694 So.2d at 197.
In light of the 1995 amendment to section 409 and the supreme court's subsequent decisions in Reichert and Palacios, we find that reports, surveys, and other data compiled or collected pursuant to section 409 are statutorily protected from discovery and admission as evidence in Louisiana court proceedings. See Reichert, 96-1419, 96-1460 at 4, 694 So.2d at 197. Such data and reports must be compiled or collected for the purpose of developing highway safety construction or improvement projects which are either implemented with federal funds or initiated by 23 U.S.C. §§ 130, 144, or 152 and, thus, are barred from discovery.
Evidentiary privileges are in derogation of the search for truth. United States v. Nixon, 418 U.S. 683, 710 n. 18, 94 S.Ct. 3090, 3108 n. 18, 41 L.Ed.2d 1039 (1974). Thus, it is well-settled that such privileges must be strictly construed. Id. Consequently, DOTD must establish that each requirement for the privilege under section 409 has been met. As it pertains to this case, section 409 will cover: (1) reports, surveys, schedules, lists, or data; (2) compiled or collected; (3) for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites or hazardous roadway conditions, and (4) pursuant to section 152. See Palacios, 98-2932 at 3, 740 So.2d at 97; see also Southern Pacific Transportation Company v. Yarnell In and For County of Maricopa, 181 Ariz. 316, 890 P.2d 611 (App.1995), cert. denied, sub nom. Southern Pacific Transportation Company v. Isbell, 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995).
Attached to DOTD's Motion to Quash and/or Motion for a Protective Order was an affidavit of Donald Marson. He stated that he was a traffic and planning supervisor for the Louisiana Department of Transportation and Development. He further stated that he had reviewed the subpoena duces tecum served upon him, that the notice requests information which is in DOTD's possession, but which is compiled *230 specifically pursuant to the provisions of 23 U.S.C. § 409 and 23 U.S.C. § 152. He went on to state:
State law requires the Louisiana Department of Public Safety (DPS) to obtain all accident reports from the various state, parish and local law enforcement agencies. At this time, DOTD assigns a mile-post number and route number to each accident. Once a year, DPS compiles an accident list from this raw data (the accident reports). The DPS then generates and compiles a computer tape, keying in all pertinent accident data, including mile marker and route number. This compiled list is then sent back to DOTD, where it is used to further compile a list of abnormal locations. Both lists are compiled on an annual basis, and specifically, to comply with federal requirements necessary to receive federal funding for highway safety improvement projects. DOTD does not maintain copies of individual accident reports.
During the evidentiary hearing on the plaintiff's Motion to Compel and the defendant's Motion in Limine held on October 13, 1997, DOTD presented the testimony of Mr. Charles Henry Miller, a statistician for the Louisiana Highway Safety Commission. He testified that his office is funded through the National Highway Regulatory Act of 1967, under Title 402, 23:402 and that they are entirely federally funded in what they do. He further testified that "[t]he primary use of our data is for law enforcement purposes, highway department purposes, highway planning, anything to do with the safe movement of people and vehicles on the highways of Louisiana. That's what we're all about and that's why we capture the data." He further testified that his office is the central repository for all data that is collected on traffic accident reports. They receive reports from state police and the various sheriffs offices and police departments. "They alleveryone mails their reports to us." The reports are first sent to Mr. Don Morrisson at DOTD to verify and correct milepost location information and to insert that information if it is omitted. The data from the reports are then put into the computer maintained by Miller's office. His uncontradicted testimony was that he is familiar with Mr. Morrisson's job and that it is not possible for Mr. Morrisson to do his job without the information that's produced in these accident reports.
We find that DOTD has met its burden in sufficiently establishing that the accident reports sought by the plaintiff were data collected or compiled specifically pursuant to 23 U.S.C. § 409 and 23 U.S.C. § 152 in an effort to comply with federal requirements and to foster an effective highway safety improvement program. It does not matter whether the information is in the possession of DOTD or of the Louisiana Highway Safety Commission's federally funded accident information database or the raw data that is used to compile that database. See Palacios, 98-2932 at 12, 740 So.2d at 101-102. Testimony by the plaintiffs expert based upon privileged documents is also precluded. Palacios, 98-2932 at 13, 740 So.2d at 102.
Therefore, the trial court erred as a matter of law in allowing the appellees to discover prior accident reports and in allowing their expert to testify regarding the substance of the accident reports and the intersection's accident history. Accordingly, appellees could not use this evidence to prove their case against DOTD.
Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. Ferrell v. Fireman's Fund Insurance Co., 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747. As the Louisiana Supreme Court explained in Evans v. Lungrin, 97-0541, 97-0577, p. 7 (La.2/6/98), 708 So.2d 731, 735:

*231 A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. (Citations omitted)
Thus, because we have determined that the trial court erred in allowing discovery of the prior accident reports and in allowing expert testimony regarding those reports, we must now review the present case de novo.

Liability of DOTD
After a de novo review of the record as a whole, minus the testimony and evidence related to the prior accident reports, we conclude that even without the privileged evidence and related testimony, appellees have met their burden of proving that at least a portion of the fault rests with DOTD.
The elements which a plaintiff must prove to recover damages from a government defendant based on a defective condition of a roadway are the same whether based upon negligence or strict liability. Faulkner v. State, Department of Transportation & Development, 25,857, 25,858, p. 5 (La.App. 2nd Cir.10/26/94), 645 So.2d 268, 273, writs denied, 94-2901, 94-2908 (La.1/27/95), 649 So.2d 390. A plaintiff must prove: (1) that the defendant owned or had custody of the thing which caused the damage; (2) that the thing was defective in that it created an unreasonable risk of harm to others; (3) that the defendant had actual or constructive knowledge of the defect or risk of harm and failed to take corrective action within a reasonable time; and (4) causation. Cormier v. Comeaux, 98-2378, pp. 5-6 (La.7/7/99), 748 So.2d 1123, 1127, Faulkner, 645 So.2d at 273.
There is no dispute that Highways 42 and 44 are within the state highway system and are maintained by DOTD. This satisfies element number one, with respect to ownership and custody, in this case.

A. DUTY

Element number two of the above referenced inquiry speaks to the issue of duty. Whether a duty is owed is a question of law. Rhodes v. Winn-Dixie Louisiana, Inc., 93-1848, p. 5 (La.App. 1st Cir.6/24/94), 638 So.2d 1168, 1170. Simply put, the inquiry is whether the plaintiff has any lawstatutory, jurisprudential or arising from general principles of faultto support his claim. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993).
DOTD has a legal duty to maintain the highways in a reasonably safe condition. Sinitiere v. Lavergne, 391 So.2d 821, 824 (La.1980). This duty "extends to the protection of those people who may be foreseeably placed in danger by an unreasonably dangerous condition." Sinitiere, 391 So.2d at 825. It extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Trahan v. State, Department of Transportation & Development, 536 So.2d 1269, 1273 (La.App. 3rd Cir.1988), writ denied, 541 So.2d 854 (La.1989). DOTD cannot knowingly allow a condition to exist which is a hazard to a reasonably prudent driver. In such a case, DOTD must take reasonable measures to eliminate or reduce the risks associated with the dangerous condition or may post adequate signs to warn the public of the danger, risk, or hazard involved. Trahan, 536 So.2d at 1273.

B. Breach of Duty

Whether the roadway at the scene of the accident was in an unreasonably *232 dangerous condition, will depend on the facts and circumstances of each case. Hunter v. Department of Transportation and Development, 620 So.2d 1149, 1151 (La.1993). DOTD cannot escape liability by simply showing that a highway met the existing standards when it was built. Aucoin v. State, Department of Transportation and Development, 97-1938, 97-1967, p. 6-8 (La.4/24/98), 712 So.2d 62, 66-67. Design standards both at the time of original construction and at the time of the accident may be relevant factors in determining whether a given stretch of roadway presents an unreasonable risk of harm, but are not determinative of the issue. Dill v. State, Department of Transportation and Development, 545 So.2d 994, 996 (La.1989). Although DOTD does not have a duty to bring old highways up to modern AASHTO[5] standards absent a major reconstruction of that highway, see Cormier, 98-2378 at 9, 748 So.2d at 1129, whether DOTD has conformed to those standards is a relevant factor in determining the ultimate issue of whether the roadway is unreasonably dangerous. Aucoin, 97-1938, 97-1967 at 7, 712 So.2d at 66.
The unreasonable risk of harm criterion entails a myriad of considerations and cannot be applied mechanically. Oster v. Department of Transportation and Development, State of Louisiana, 582 So.2d 1285, 1288 (La.1991). Although courts have described the unreasonable risk of harm criterion as requiring the reviewing court to balance the likelihood and magnitude of harm against the utility of the thing, the balancing test required by the unreasonable risk of harm criterion does not lend itself well to neat, mathematical formulations. Cormier, 98-2378 at 8, 748 So.2d at 1128. In addition to the likelihood and magnitude of the risk and utility of the thing, the interpreter should consider a broad range of social, economic, and moral factors including the cost to defendant of avoiding the risk and the social utility of the plaintiff's conduct. Oster, 582 So.2d at 1288.
The record in this matter establishes that the intersection of Highways 42 and 44, constructed in the 1920's, was a "Y" intersection, rather that a "T" intersection. At the time of construction, there were no standards or recommendations regarding the design of highway intersections. However, the record demonstrates that, since the 1950's, the AASHTO geometric design manual has advised that all intersections be "T" rather "Y" intersections. Further, it is clear that DOTD has long been aware of this AASHTO standard. Further, it was also shown that the site chosen for this intersection, in a curve along Highway 44, did not conform to AASHTO guidelines.
The record demonstrates that an increased danger of automobile collisions, due to a poor sight picture, is the basis of AASHTO standards recommending against both the construction of "Y" intersections and the construction of intersections in a curve.
Additionally, the record demonstrates that there were several driveways and parking lots in close proximity to the intersection of Highways 42 and 44. Also, there is a building within the intersection itself, which is to the left of a driver attempting a left turn onto Highway 44. Both parties' experts testified that these structures created a higher number of points of conflict than is desirable within the vicinity of any intersection. As such, this increases the amount of information which a driver must process and act upon. Where there is such an increase, a driver can be confused and unable to comprehend everything which is occurring at an intersection.
Experts for both parties acknowledged that a "stack," or line, of cars waiting to *233 turn left onto Highway 44 would experience sight restrictions caused by the seafood market that stands within the intersection itself. Each of the experts acknowledged that this sight restriction could add to the confusion of drivers, especially those turning left onto Highway 44 or traveling eastward along Highway 44. However, the experts gave differing opinions on the degree to which the sight restriction caused by this structure would contribute to an accident, or its importance as a factor used to monitor the safety of the intersection. Appellees' experts believed that this sight restriction was an important factor in both accidents involving left turning vehicles and consideration of the safety of the intersection, while appellants' expert attributed the accident to Mrs. Sevario's driving error.
Furthermore, appellees' expert, Jim Clancy, testified that traffic volume at this intersection, which he personally observed, and the accident history, met two of several Manual on Uniform Traffic Control Devices (MUTCD) warrants which qualify this intersection for a traffic signal. While appellant's expert, Dr. Joseph D. Blaschke, testified that such a decision was based upon the discretion of the engineer in this district.
There were lay witnesses who testified about their prior accidents at this intersection as well. Specifically, Cynthia Brassette, Marian Caster and Lorraine Hebert, all testified regarding similar "left turn" accidents in which they were involved. Each of these witnesses testified that they did not see the vehicle proceeding on Highway 42 prior to each accident. Furthermore, Ms. Brassette and Ms. Hebert testified that they know that this intersection has a reputation as being "dangerous."
Finally, the record contains additional lay witness testimony demonstrating that DOTD had knowledge of the dangers associated with this intersection. Joseph A. Sevario, III,[6] who was a Louisiana state senator from 1975 until May 1994 representing the community in which the highways at issue are located. Mr. Sevario testified that in response to various complaints he received from his constituents, he discussed remedying the problems at this intersection with various people at DOTD. Specifically, he contacted the Secretary of DOTD, as well as the engineering section, on several occasions, wrote a number of letters to DOTD, and met at the intersection with DOTD employee on numerous occasions, requesting that the intersection be changed to a "T" design. Additionally, William Hayward, the owner of Hayward's Seafood Restaurant located in the middle of the intersection, testified that he has lived in the community all his life and his business has been at its present location for nine years. According to Mr. Hayward, usually there are two or three accidents per week at this intersection, and sometimes more under inclimate weather conditions.
In 1993, in what appears to be a response to various complaints from individuals in the community regarding the dangerous nature of this intersection and the large number of accidents at this location,[7] DOTD modified the flow of traffic at this intersection. In other words, whereas prior to that time traffic flowed in both directions on each "arm" of the "Y," traffic now flows in only one direction on each "arm" of the "Y." However, there are no warning signs leading to the intersection. Furthermore, there are no caution or traffic signal lights at the intersection. According to the lay testimony, the "traffic *234 flow" change has not decreased the dangerous nature of this intersection. Specifically, Mr. Hayward testified that the change simply moved the location of the accidents.
Disregarding accident history (generated by the accident reports) and the expert testimony regarding the accident history associated with this intersection, all of which we have determined to be privileged and, thus, inadmissible, we conclude that DOTD breached its duty to maintain this intersection so it does not pose an unreasonably dangerous condition to the motoring public, notwithstanding the intersection at issue is an old highway. After carefully reviewing the record in this case, we find this intersection unreasonably dangerous. The fact that the intersection is constructed in a curve, the location of various driveways and parking lots in close proximity to the intersection, the location of the restaurant within the intersection, and the large number of traffic accidents that occur at this intersection support this conclusion.
While DOTD may not have been required to comply with the recommendations of AASHTO, i.e., change from "Y" to a "T" design, DOTD, at the very least, had a duty to post warning signs for motorists approaching this intersection. Furthermore, applying the risk-utility analysis, in light of the testimony concerning the large number of accidents that occurred at this intersection, DOTD should have placed a caution light or traffic signal at the intersection. Testimony at trial revealed that the cost associated with installing a traffic signal was between $15,000.00 and $20,000.00; the cost associated with installing caution lights would be less than the cost of installing a traffic signal. Clearly, the likelihood of harm and magnitude of risk were great; whereas, the costs associated with DOTD reducing the risks were low in comparison. Accordingly, DOTD is answerable for damages sustained by appellees as the result of this accident.

Liability of Mrs. Sevario
We, however, opine that Mrs. Sevario's own negligence contributed to the cause of this accident, and she must be allocated a portion of the fault. A motorist has a duty to maintain a careful lookout, observe any obstructions present, and exercise care to avoid them. Ly v. State Through Department of Public Safety and Corrections, 633 So.2d 197, 201 (La.App. 1st Cir.1993), writ denied, 93-3134 (La.2/25/94), 634 So.2d 835. A left turn is one of the most dangerous maneuvers a motorist may execute and requires the exercise of great caution. Thomas v. Petrolane Gas Service, Limited Partnership, 588 So.2d 711, 717 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1201 (La.1992). Before attempting a left turn, a motorist should ascertain whether it can be completed safely. Theriot v. Lasseigne, 93-2661, p. 8 (La.7/5/94), 640 So.2d 1305, 1312. At trial, both Mrs. Sevario and her passenger, Mona Kelly, testified that Mrs. Sevario came to a complete stop and looked both ways before entering the intersection. According to Mrs. Sevario, she never saw the Lambert vehicle. Henry E. Corvers, III, a witness to the accident, testified that he was stopped at the intersection in the right-turn lane. Mrs. Sevario, who was a long-time member of the community, testified that she knew this was a dangerous intersection.
According to Mr. Corvers, he did not proceed with his right turn because he saw the Lambert vehicle approaching. He also testified that Mrs. Sevario barely stopped. Instead, he testified that she came to "a rolling stop" and then proceeded to make a left turn. Based on this testimony we conclude that although the intersection was unreasonably dangerous, Mrs. Sevario's failure to maintain a careful lookout and to execute the left turn with great caution, especially in light of her knowledge of the reputation associated with this intersection, was a substantial factor in causing the accident.
*235 In light of all the evidence reviewed, we conclude that the concurring fault of DOTD and Mrs. Sevario was the legal cause of the accident. We must now determine the percentages of fault to allocate between the parties. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967, 974 (La.1985) sets forth various factors that may be considered when assessing the degree of fault to assign to each party. These factors include:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Watson, 469 So.2d at 974.
Our consideration of these factors suggest that the majority of fault rests with DOTD. Clearly, DOTD had actual knowledge of the dangers associated with this intersection for many years and were aware that additional measures needed to be taken to make the intersection safe. The evidence demonstrates, even if DOTD was not economically prepared to do a major reconstruction of this intersection, cost-effective measures of reducing the risks, such as placing warning signs, installing a caution light or traffic signal, were available.
Additionally, the factors require that we apportion some fault to Mrs. Sevario. She was very familiar with this intersection and was aware that extra caution must be used to execute an extremely dangerous maneuver, such as a left turn, at this intersection. However, the conversation she was engaged in with Ms. Kelly regarding another vehicle and the testimony of Mr. Corvers, indicate that she was not as attentive as we believe was necessary to avoid an accident.
Thus, after weighing the factors, we apportion fault as follows. To Mrs. Sevario, we assign 40% of the fault. To DOTD, we assign 60% of the fault.

Damages
A thorough review of the evidence establishes the following facts regarding the injuries suffered by Mrs. Sevario. Following the accident, Mrs. Sevario, who was thirty-six years old at the time of the accident, was trapped in her vehicle until she was extricated by emergency workers using the "jaws of life." She was then taken by helicopter to Our Lady of the Lake Hospital in Baton Rouge. Mrs. Sevario waited several hours in the emergency room, in great pain, while doctors diagnosed the extent of her injuries.
Mrs. Sevario suffered several serious injuries, including: 1) a crushed pelvis, 2) several pelvic fractures, 2) an intertrochanteric fracture of the femur, 3) a fractured sacrum, and 4) a dislocated sacral joint. Mrs. Sevario underwent a total of five operations, three of which were performed during her initial stay at Our Lady of the Lake. During the third procedure, doctors inserted an external fixator to stabilize her pelvis. This device is composed of pins which are screwed into the pelvis and protrude several inches out of a patient's body. This device remained inserted for six weeks, after which it was removed during a fourth surgical procedure.
The fifth surgery, which was performed in May 1996, was an attempt to correct structural deficiencies which could not be corrected during previous procedures. In this procedure, doctors cut the bone in Mrs. Sevario's left foot and realigned her foot.
Mrs. Sevario underwent physical therapy which taught her how to walk again. *236 Mrs. Sevario underwent two periods of physical therapy. The first period lasted from May to December 1996. The second period was during April of 1997. While Mrs. Sevario was able to walk after this treatment, she often requires the assistance of a walker or a cane.
Mrs. Sevario's hips and legs remain misaligned. Plates and screws were placed in her left femur, pelvis, sacral joint and sacrum. Also, Mrs. Sevario has thirty-four and one-half inches of scars as a result of the surgical procedures. The largest goes from the lower part of her back, from right to left, and down her left leg.
Also, Mrs. Sevario has some short-term memory loss and suffers from depression brought about by the extent of her injuries. She suffers from chronic pain, which may likely require pain medication and anti-inflammatory medication during her remaining lifetime. As a result of the pain, Mrs. Sevario can no longer clean her home, sit through movies, or walk with her family.
The trial court awarded Mrs. Sevario $440,000.00 in special damages and $1,575,000.00 in general damages. As discussed above, the legal error committed by the trial court requires us to determine de novo an appropriate award. A careful review of the record demonstrates that an award of $440,000.00 in special damages is supported by the record.[8] Accordingly, we affirm that portion of the damage award. A review of cases with similar multiple injuries and surgeries leads us to conclude that the general damage award should be $1,000,000.00. See Clement v. Griffin, 91-1664, 92-1001, XX-XXXX-XX, and 93-0648 (La.App. 4th Cir.3/3/94), 634 So.2d 412, writs denied, 94-0717, 94-0777, 94-0789, 94-0791, 94-0799, 94-0800 (La.5/20/94), 637 So.2d 478, 479; Page v. Gilbert, 598 So.2d 1110 (La.App. 4th Cir.), writs denied, 605 So.2d 1146, 1150 (La. 1992); Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
In light of our de novo review of this case, we pretermit discussion of assignments of error four and seven.

CONCLUSION
For the foregoing reasons, the jury verdict in this matter is reversed in part and affirmed in part. Specifically, the judgment in favor of appellees and against appellant, assessing of 100% of the causative fault, is reversed; judgment assessing DOTD 60% of the fault and Mrs. Sevario 40% of the fault is rendered. Regarding damages, the general damage award in the amount of $1,575,000.00 is reduced to $1,000,000.00. The special damage award is affirmed. The entire damage award shall be reduced in proportion to Mrs. Sevario's percentage of fault. Costs of this appeal in the amount of $6,274.23 are to be divided equally between appellees and DOTD.
REVERSED AND RENDERED IN PART; AND AFFIRMED IN PART.
FITZSIMMONS, J., concurs.
NOTES
[1] Trinity later moved for summary judgment, as to the claims filed against it. The motion was granted on April 10, 1997, and Trinity was dismissed from the suit with prejudice.
[2] As amended by Pub.L. 104-59, Title III, § 323, 109 Stat. 591 (1995). A comma has been inserted after "identifying" based on the note contained in the statute.
[3] 23 U.S.C. § 130(d) requires, inter alia, that states participating in funding thereunder survey highways to identify railroad crossings which "require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 144(b), similarly, requires, inter alia, an inventory of all highway bridges "on any Federal-aid system ... [and] assign each a priority for replacement or rehabilitation...." 23 U.S.C. § 152(a) requires that participating states survey "all public roads to identify hazardous locations ... assign priorities for the correction of such locations ... and implement a schedule of projects for their improvement."
[4] Other courts have recognized that the statute "facilitate[s] candor in administrative evaluations of highway safety hazards," Robertson v. Union Pacific Railroad, 954 F.2d 1433, 1435 (8th Cir.1992), and prevents federally required record-keeping from being used as a "tool ... in private litigation." Id.
[5] AASHTO is an acronym for the American Association of State Highway and Transportation Officials.
[6] Mr. Sevario testified that he is not, to his knowledge, related to the Sevarios that are parties to this litigation.
[7] In June of 1992, Claude M. Dornier, a lay witness that testified at trial, sent a complaint letter to DOTD. In the letter, Mr. Dornier suggested the traffic-flow changes that were ultimately made in 1993. Additionally, a petition to change the intersection from a "Y" to a "T" was circulated sometime in 1992 or 1993.
[8] Additionally, we note that although DOTD's assignment of error is related to the entire damage award given to Mrs. Sevario, its brief of this issue was limited to a discussion of the general damages awarded to Mrs. Sevario. Thus, we consider as abandoned DOTD's objection to the special damages awarded in this case. Doucet v. Champagne, 94-1631, p. 1 (La.App. 1st Cir.4/7/95), 657 So.2d 92, 100 (per curiam on rehearing), writs denied, 95-1759, 95-1887 (La.11/3/95), 661 So.2d 1379, cert. denied, sub nom. Louisiana Department of Transportation and Development v. Doucet, 517 U.S. 1120, 116 S.Ct. 1353, 134 L.Ed.2d 522 (1996). Nevertheless, we have reviewed the award and find that it is supported by the record.