536 So.2d 1269 (1988)
Keith Wayne TRAHAN, Plaintiff-Appellant,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION & DEVELOPMENT, Defendant-Appellee.
No. 87-971.
Court of Appeal of Louisiana, Third Circuit.
December 14, 1988.
Rehearing Denied January 23, 1989.
*1270 Hollier & Ringuet, Reginald J. Ringuet, James L. Daniels, Lafayette, for plaintiff-appellant.
*1271 Bertrand & Soileau, Carol S. Hunter, Charles E. Soileau, Rayne, George Privat, Lafayette, for defendant-appellee.
Before DOMENGEAUX, DOUCET and YELVERTON, JJ.
DOUCET, Judge.
This appeal arises out of an action instituted by plaintiff, Keith Wayne Trahan, for damages sustained as a result of severe injuries he received in a one vehicle accident. At the time of the accident, plaintiff was a guest passenger in an automobile owned and being driven by Mark Daigle (Daigle).
Named as defendants were Daigle, his liability insurer, Fireman's Fund Insurance Company, and the State of Louisiana, through the Department of Transportation and Development (DOTD).
After a bench trial, the district court rendered written reasons finding that Daigle's negligence was the sole cause of the accident, thereby absolving the DOTD from any liability. Formal judgment in the amount of One Million ($1,000,000) Dollars was signed in accordance with the court's reasons. It is from this judgment that plaintiff appeals.
The accident occurred on January 26, 1985, during the evening hours at approximately 10:30 p.m. At the time of the accident, the weather was clear and dry. Daigle, as operator of his vehicle, along with plaintiff and Dwynn Landry (Landry) as guest passengers, were en route from Eunice to Rayne. Daigle turned on to La. 95, traveling in a southerly direction. None of the occupants of the car had ever previously been on this road. Daigle had his cruise control set at 59 m.p.h. and had safely negotiated all of the curves previous to the accident curve. The last curve was signed for 45 m.p.h. While negotiating the last curve, Daigle disengaged the cruise control which slowed down the vehicle. Daigle then reset the cruise control and accelerated while coming out of the curve. As Daigle reset the cruise control, he saw the curve and 25 m.p.h. speed advisory signs and realized that a curve was ahead, but did not know the location of it. Daigle then applied his brakes to disengage the cruise control and began slowing down. After passing the signs, plaintiff admitted to being momentarily inattentive. It was at this point when Daigle looked up and the sharp curve appeared. Confronted with the imminence of the curve, Daigle applied his brakes, but was unable to stop the vehicle before going through the curve and striking a tree located nearly 13 feet away. All three occupants were knocked unconscious by the impact and the car was demolished. Daigle was ticketed for failure to maintain control of his vehicle. The trooper who investigated the accident confirmed that Daigle was not intoxicated, although he smelled alcohol on his breath.
We first address plaintiff's assertion that the district court erred in holding that Daigle's negligence was the sole cause of the accident.
In its written reasons for judgment, the district court made the following findings of fact: (a) the sole cause of the accident was the negligence of the driver, Mark Daigle, in not slowing down and for being inattentive just prior to the accident; (b) the DOTD did not breach its duty to the traveling public to alert Daigle to the location of the curve; and, (c) even if there had been a breach of the DOTD's duty, the breach was not the legal cause of the accident.
The finding of liability by the trial court is a finding of fact which a reviewing court may not disturb unless, (a) the record evidence does not furnish a sufficient basis for that finding, or (b) the finding is clearly wrong. Arceneaux v. Domingue, 365 So. 2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973).
Plaintiff asserts that the DOTD breached its duty to the traveling public to alert drivers such as Daigle to the location of the curve by not placing flat-arrow and/or chevron warning signs in the curve. The DOTD, of course, strenuously denies this assertion.
It is well established that the "duty-risk" analysis is the process employed in *1272 Louisiana for determining whether liability exists under the facts of a given case. The following questions are considered in this analysis:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) Was there a duty owned by the defendant to protect the plaintiff from this type of harm arising in this manner?
(3) Did the defendant violate the duty owed?
See Mart v. Hill, 505 So.2d 1120 (La.1987); Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Crowe, The Anatomy of a Tort, 22 Loy.L.Rev. 903 (1976); McNamara, The Duties and Risks of the Duty-Risk Analysis, 44 La.L.Rev. 1227 (1984).
Applying the duty-risk analysis to the facts of the instant situation leads us to the threshold question of whether the DOTD's failure to install flat-arrow and/or chevron signs in the curve to alert the drivers to the presence of the curve was a cause-in-fact of the accident.
An act of omission is considered to be a cause-in-fact of harm to another if it was a "substantial factor" in bringing about the accident. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970); Lejeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978). Restatement of Torts 2d, Sections 431-33 (1965). As noted in the restatement, factors which may be considered in determining whether the actor's negligence is a substantial factor include "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm ..."
The "substantial factor" test is akin to the "but for" test (i.e. the accident would not have happened but for the defendant's negligence), except that where more than one party's negligence would have caused the accident absent the other party's negligence, Dixie, supra, and Lejeune, supra, hold both to be causative.
As succinctly stated by the Louisiana Supreme Court in Lejeune, supra:
"As Prosser [on Torts, Section 41 at pp. 237-38 (4th Ed.1971) ] notes, the `but for' test (that the accident would not have happened but for the defendant's negligence), while it explains the greater number of cases, does not serve as an adequate test for the present situation: `If two causes occur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result, some other test is needed ...' In such cases it is quite clear that each cause has in fact played so important a role in producing the result that responsibility should be imposed upon it; and it is equally clear that neither can be absolved from that responsibility upon the ground that the identical harm would have occurred without it, or there would be no liability at all. Id., p. 239."
As previously stated, the district court concluded that "the sole cause of the accident was the negligence of the driver, Mark Daigle, in not slowing down when he observed the speed and curve advisory signs, and for being inattentive just prior to this accident." Obviously, the district court made a finding that the accident would have occurred even if the flat-arrow and/or chevron signs had been present.
The conclusion, however, rests on the implicit hypothesis that Daigle would have ignored the flat-arrow and/or chevron signs. This hypothesis rests on the speculative inference that the presence of highly reflective flat-arrow and/or chevron signs, which would have been clearly visible from Daigle's headlights at the same time that he saw the curve advisory sign, would not have alerted Daigle to the location of the curve and a greater need for caution than was represented simply by a curve advisory sign. To some extent, the inference relies upon an unjustified assumption that an oncoming driver, such as Daigle, would have reacted to the curve advisory sign in the same manner, whether he had simply passed it, as here, or whether instead, he was put on further notice by the flat-arrow *1273 and/or chevron signs that the curve was situated directly ahead of him.[1]
While we agree with the district court that Daigle was negligent because he did not sufficiently slow down and because of his momentary inattentiveness, to stop the process of determining causation at this point is to ignore the "substantial factor" rule.
Conceding that the accident might possibly have occurred if the flat-arrow and/or chevron signs had been in place before the accident, it is equally true that the accident might not have happened except for the combined negligence of both the DOTD and Daigle. Stated yet another way, the negligence of both the DOTD and Daigle was a "substantial factor" in producing the situation which resulted in the harm sustained by plaintiff. As such, pursuant to Dixie, supra, and Lejeune, supra, we find the negligence of both the DOTD and Daigle to be causative. As stated in Dixie, supra, 137 So.2d at 304:
"The mere possibility that the accident would have occurred despite the required precautions does not break the chain of causation."
In light of the foregoing, we find that the first rung of the three part approach of the duty-risk analysis is satisfied as the DOTD's negligence was a cause-in-fact of the accident. The district court was clearly wrong when it failed to make such a finding.
Having determined that the DOTD's failure to install the flat-arrow and/or chevron signs was a cause-in-fact of the accident, we must now determine whether the DOTD owed a legal duty to the traveling public which encompassed the particular risk of harm to which plaintiff was exposed in this case.
It is a well settled principle that the DOTD has a legal duty to the traveling public to warn against an exceedingly dangerous curve. As stated in Vervik v. State, through Department of Highways, 302 So.2d 895 (La.1974):
"The Department of Highways is not an insurer of the safety of drivers upon the roads and highways of this state. However, reasonable care requires, and the Department does owe, a duty to the traveling public to erect barracades, signs and adequate markings to warn against extremely dangerous, trap-like hazards, unusual obstructions, perilous conditions or defects in the road.
Especially is this duty imposed where the situation is inherently dangerous as where ... there are dangerous curves in the highway. (302 So.2d at p. 897)."
This duty extends not only to prudent and attentive motorists, but also to those who are slightly exceeding the speed limit or who are momentarily inattentive. Burge v. City of Hammond, 494 So.2d 539 (La.1986); Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970); Ledbetter v. State, Through Department of Transportation and Development, 482 So.2d 1035 (La.App. 3rd Cir.1986), 502 So.2d 1383 (La. 1987).
There is no doubt that the curve in question is extremely dangerous. Thus, pursuant to Vervik, supra, the DOTD owed a duty to the traveling public to warn against this extremely dangerous curve. Moreover, we find that the duty owed (to properly warn oncoming motorists of the dangerous nature of the curve) encompasses the particular risk of harm to which plaintiff was exposed to in this case (the risk that a slightly inattentive motorist who was exceeding the speed limit to some degree would fail to timely spot this virtually unmarked curve in the hours of darkness before it was too late to avoid the accident).
We will next determine whether the DOTD breached its duty owed to the traveling public.
As stated in Vervik, supra, at p. 897:
"There are no hard and fast rules established in law governing the particular type warning to be given in the various factual situations arising in these cases. It is understood, however, that the warning should be so designed in size and *1274 character as to adequately warn and alert the traveling public to the danger ahead. Whether the warning is required, reasonable or adequate is determined by the place where the danger exists, the nature of the road and the general situation and circumstances surrounding it. All of these factors, together with the kind of speed of vehicles, are to be taken into consideration to determine whether the department has discharged its duty."
As previously stated, there is no doubt that the curve in question is extremely dangerous. The curve is dangerous principally because of its degree of curvature. The degree of curvature of the curve in question is 28 degrees. By way of comparison, the degree of curvature involved in the landmark case of Vervik, supra, was a mere five degrees. The Louisiana Supreme Court in Vervik, supra, expressly stated that a curve having an angle of curvature of five degrees was "exceedingly dangerous." The degree of danger posed by a 28 degree curvature is emphasized by the DOTD's current standards, which prohibit the construction of a roadway having any curve which degree of curvature is greater than five and one-half degrees. While we are aware that the DOTD is not required to bring existing substandard roads (i.e., those with a degree of curvature greater than five and one-half degrees) up to current design standards, these roads are required to be adequately signed.
In addition to the severity of the curve, the curve was also extremely dangerous because of the wholly inadequate manner in which it was signed. At the time of the accident, there were no signs in the curve to delineate its location to alert southbound drivers such as Daigle. However, in 1968, many years before the accident, the DOTD had delineated this curve's location with numerous hazard signs. These signs were located on the outside shoulder of the curve. These signs were highly reflective and could be seen bi-directionally. However, at the direction of C. Ray Fontenot and Richard M. Flanagan, two DOTD employees, all of the bi-directional hazard delineators were removed because they were outdated and because they were frequently knocked down. At this same time, Flanagan and Fontenot verbally ordered the maintenance crews to install a flat-arrow sign on the shoulder of this curve for southbound traffic. The record reflects that there was never any follow-up to determine whether the order had been carried out, as is the custom when the order issued is a verbal one. It was established that this sign was not in place on the evening of the accident. In fact, the DOTD offered no evidence indicating that the flat-arrow sign had ever been installed for southbound traffic as Fontenot and Flanagan had ordered in 1980. Flanagan admitted that the sign must have been necessary, otherwise he would have never ordered it to be installed.
Lawrence Harry, one of DOTD's own expert witnesses, admitted that in a situation where there has been a verbal order for the installation of a sign and the sign had not been installed for six years, such a failure would have been imprudent.
Trooper James F. Simon testified that he investigated six or seven different accidents at this very location. Simon described the curve as a sharp one and stated that this is a typical accident at this location where somebody at night takes the curve too fast, goes off of the roadway and hits a tree. Simon added that most of the vehicles involved in accidents at this location have to be towed away. It was Simon's opinion that there was a problem with the curve and he testified that he related this fact to the DOTD and requested them to look into the situation.
Duaine T. Evans, an expert in traffic engineering, opined that this is an extremely severe curve. Moreover, Evans opined that in the hours of darkness, one could not perceive the severity of the curve and it was therefore a trap to some degree. Evans testified that the curve could have been adequately signed with a large arrow or chevron signs, or both. Evans opined that had the flat-arrow and chevron signs been installed in the curve, Daigle would have likely seen and heeded them. Evans added *1275 that the purpose of the signs is to alert drivers to the presence of a curve, particularly at night, when there are less visual cues available for a driver to pick up.
The lower court found that the markings present on the night of the accident were adequate for this curve. The markings consisted of a curve advisory sign, a speed plate located 416 feet from the curve in question, and "no passing" stripes on the road. Because of the location of the curve advisory sign and speed plate, they were not visible to southbound traffic until the preceding curve had almost been passed. The distance from its initial point of visibility to the point where an oncoming vehicle passed was 143 feet and it took but 2.1 seconds for a vehicle traveling at 40 m.p.h. to travel this short distance.
While these markings may have been adequate for a cautious driver who is familiar with the road, the question is whether these markings were adequate for one driving in the hours of darkness at a slightly excessive speed who is momentarily inattentive and who is totally unfamiliar with the road. In light of the foregoing evidence, we find that the answer to this inquiry is in the negative. As such, we find that DOTD breached its duty to the traveling public in its failure to adequately warn. The district court was clearly wrong when it failed to make such a finding.

APPORTIONMENT OF FAULT
La.C.C. art. 2323 provides:
"When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss."
In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La. 1985), the Louisiana Supreme Court set forth guidelines for applying the mandate of La.C.C. art. 2323, stating:
"We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties." (footnote omitted)
We determined that the DOTD breached its duty to the traveling public by failing to install adequate warnings of the exceedingly dangerous curve. This conduct created a substantial risk of harm to motorists. The DOTD knew of the dangerous nature of the curve and this is evidenced by the fact that bi-directional hazard signs had previously lined the curve and also that the DOTD ordered a flat-arrow sign to be installed but such order was never carried out. If the curve had been adequately signed, Daigle may have been able to avoid the accident. We apportion the fault of the DOTD at 50%.
*1276 It is uncontroverted that Daigle was at fault in causing the accident, but as previously stated, we find that he was not the sole cause of the accident. Daigle was exceeding the posted speed limit and was momentarily inattentive immediately before the imminence of the curve became apparent. Daigle knew or should have known of the danger presented by such conduct. Daigle's conduct created a substantial risk of harm. We apportion Daigle's fault at 50%.

QUANTUM
In addressing plaintiff's assertions of error as to the district court's award of damages we quote the applicable law as set forth by the Louisiana Supreme Court in Coco v. Winston Industries, Inc., 341 So. 2d 332 (La.1976):
"We do reemphasize, however, that before a court of appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award.... Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.... It is never appropriate for a court of appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence." (citations omitted)

SPECIAL DAMAGES
The lower court awarded plaintiff $1,000,000 for his special and general damages. Plaintiff asserts that this was clearly error since his special damages alone amount to $1,064,212.11. We agree.
At trial, all parties stipulated to the authenticity and connexity of $171,053.80 worth of medical expenses incurred by plaintiff.
Dr. Glenn A. Ally, a clinical psychologist who treated plaintiff, testified that plaintiff remains with deficits in recent memory, social judgment and psychomotor abilities. Ally added that plaintiff continues to manifest difficulties with anomia. Ally opined that plaintiff is likely to engage in socially inappropriate behavior and does not feel that plaintiff is capable of competitive employment. Ally added that it is unlikely that significant gains will be obtained and that plaintiff has most likely reached a plateau.
Dr. John Grimes, an expert in vocational rehabilitation, opined that plaintiff's aptitudes are significantly below par. Grimes added that plaintiff's cognitive deficits are contributory and inappropriate social skills are apparent. Moreover, Grimes was of the opinion that plaintiff is totally and permanently disabled as he has reached maximum recovery.
Both Ally and Grimes recommended that plaintiff attend a cognitive re-training facility; the purpose of which would be to increase the quality of plaintiff's lifestyle. Both doctors testified that there is usually at least a one-year commitment and such cost would be $180,000.
Dr. Bernard F. Pettingill, Jr., an expert economist, established that the present value of plaintiff's total economic loss for past, present and future wages totals $713,158.31.
In light of the foregoing, we find that the district court was clearly wrong when it awarded plaintiff a total of $1,000,000. We will increase the award of special damages to $1,064,212.11, which is the lowest point that is reasonably within the discretion afforded the court.

GENERAL DAMAGES
As previously stated, the lower court awarded plaintiff a total of $1,000,000. Since this amount does not even cover plaintiff's special damages, we find this to be a gross abuse of the discretion afforded to the trial court.
It was established at trial that plaintiff suffered severe injuries and was hospitalized for over 1½ months after the accident. Thereafter, plaintiff was released from the *1277 hospital to the care of his parents with whom he resided for approximately one year.
At the time of the accident, plaintiff was twenty-one years old and a high school graduate. Plaintiff was described by his friends and family as an amicable young man who was ambitious and hard working. For several years preceding the accident, he had been employed by Marlin Drilling Company as a roustabout and a roughneck, and was in training to become a driller.
The record evidence leaves no doubt as to the severity of plaintiff's injuries. Dr. J. Robert Rivet, a neurologist, testified that he performed three separate brain operations on plaintiff. Dr. Rivet first did a craniectomy on plaintiff which consisted of removing the portion of the bone that was pushed down into his brain. Dr. Rivet then performed a second operation on plaintiff which consisted of taking out the tip of his left temporal lobe. (15% of his brain.) Dr. Rivet performed a third operation on plaintiff. The purpose of the operation was to place an acrylic plate to replace the portion of the skull removed on the night of the accident. For eight months, plaintiff did not have a skull or any other protection on the left temporal side of his head. Plaintiff had a caved-in section where only skin tissue protected his brain from outside intrusion. Rivet added that plaintiff's last EEG showed dysfunction present in his entire left hemisphere and noted plaintiff's behavior as inappropriate.
Plaintiff experienced further complications from the accident. Dr. Margaret Longo treated plaintiff for a partial collapse of his right lung. Because of this condition, Dr. Longo had to perform a thoracostomy, which is an operative procedure in which a tube is placed into the hemithorax and it is hooked up to a machine to relieve the collapsed lung by drawing the air out. Additionally, Dr. Long performed a tracheostomy on plaintiff because he was having persistent difficulty with adequate respiration on his own and needed ventilory support.
Plaintiff was also treated by Dr. Patrick Herrington for gastro-intestinal complications and by Dr. C. Barrett Alldredge for problems associated with temporary and partial paralysis of his left vocal cord, both of which were associated with the brain injuries.
Following the accident, plaintiff developed benign fibrous nodules, or tumors, overlaying the joints of his hands and fingers. This condition is commonly referred to as "knuckle pad disorder." Dr. James Lipstate treated plaintiff for this condition and while he could not state with a medical certainty that the tumors resulted from plaintiff's head injury, he did testify that recent medical studies show an association between this condition and those taking phenobarbital. Plaintiff has been taking this drug since his lobectomy.
Dwynn Landry, a passenger in the vehicle at the time of the accident, and long time friend of plaintiff, testified that plaintiff has lost many friends as a result of the accident. Landry added that plaintiff is now extremely argumentative and has a horrible temper. Landry testified that plaintiff was very "easy going" before the accident. Landry added that plaintiff has trouble remembering names and communicating with other people and can't play golf or fish like he could before the accident.
Patricia Trahan, plaintiff's mother, testified that after the accident, she had to teach plaintiff how to shave, eat, go to the bathroom, etc.... Mrs. Trahan stated that when plaintiff lived with her for several months after the accident, he was aggressive and depressed and had many arguments with his family members. Plaintiff's mother added that her son is now quick tempered and obnoxious and has lost many friends as a result. Mrs. Trahan added that plaintiff cannot now tolerate smelling certain odors such as cleaning fluids, etc....
Additionally, plaintiff has suffered scarring as a result of the accident in that he has a horseshoe shaped scar commencing from his left temporal area, going into his head and ending behind his ear, and he has been disfigured by the tracheostomy in his throat. Considering the extent of plaintiff's injuries, his past and future physical *1278 pain and suffering, disability and disfigurement, and the consequential effect on his enjoyment of life, we feel the lower court's award of a total of $1,000,000 (for both general and special damages) was a gross abuse of discretion. Having made this finding, we are bound to raise the award only to the lowest amount which would have reasonably been within the discretion of the court. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra. Both plaintiff and defendant cite cases to assist us in our review and proper determination of an award of general damages. However, it is not necessary for us to recite a litany of previous awards to justify our modified award for general damages. As the Supreme Court wisely stated in Coco, supra, "[c]ourts of appeal have placed too much emphasis on their review of other reported decisions. Certainly no two cases are ever fully alike. And whether two cases are so similar as to produce like quantum judgments is hardly discernible by gleaning the facts of a comparable decision from simply a written opinion of an appellate tribunal."
Plaintiff sets a minimum award for general damage at $1,000,000. We find that amount exceeds the lowest award which the court could have reasonably awarded. Considering such factors as the extent of plaintiff's injuries and his age, we find that the lowest amount which, in its discretion, the court could have reasonably awarded plaintiff is $700,000.
For the reasons assigned, we amend the judgment of the trial court, and as amended, recast to read as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that judgment be and hereby is rendered in favor of plaintiff, KEITH WAYNE TRAHAN, and against defendants, THE STATE OF LOUISIANA, THROUGH THE DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT and MARK DAIGLE and his insurer, FIREMANS FUND INSURANCE CO., in solido, in the sum of ONE MILLION, SEVEN HUNDRED SIXTY-FOUR THOUSAND, TWO HUNDRED TWELVE AND 11/100 ($1,764,212.11) DOLLARS, together with legal interest from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the fees for expert witnesses be fixed as follows and taxed as costs of court:

 Dr. James Rivet $350.00
 Dr. James Lipstate 350.00
 Dr. Margaret Longo 250.00
 Dr. John Grimes 350.00
 Dr. Glenn Ally 350.00
 Duaine Evans 250.00
 Bernard Pettingill 350.00
 Lawrence C. Harry 250.00
 Ned E. Walton 250.00

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the costs of court at both the district and appellate levels are assessed 50% to defendant, MARK DAIGLE AND HIS INSURER, FIREMANS FUND INSURANCE CO., and 50% to defendant, STATE OF LOUISIANA THROUGH THE DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
AMENDED, AND RECAST AS AMENDED.
NOTES
[1] See Lejeune, supra, for further support.