790 So.2d 51 (2001)
Harry ODOM, Curator of MKW, et al.
v.
CITY OF LAKE CHARLES, et al.
No. 00 01050-CA.
Court of Appeal of Louisiana, Third Circuit.
January 31, 2001.
Rehearing Denied March 28, 2001.
Writ Denied June 22, 2001.
*52 Donald Coleman Brown, Woodley, Williams, et al., Lake Charles, LA, Counsel for State of LA., DOTD.
Christopher Paul Ieyoub, Plauche, Smith & Nieset, Lake Charles, LA, Counsel for Harry Odom, Curator of MKW, Jennifer Ann Gobert, on behalf of CMG & CDG.
Court composed of YELVERTON, DECUIR, and AMY, Judges.
*53 YELVERTON, Judge.
This appeal involves a one-vehicle accident on Interstate 10 on the Lakeshore Drive overpass in Lake Charles. Michael Williams was on his way to work at Conoco around 7:00 a.m. on September 18, 1991. A couple of Williams' coworkers passed Williams while he was traveling in the right lane headed West. Earlier there had been a wreck on the Calcasieu River Bridge up ahead, which was causing traffic to back up. A west-bound driver could not see the backed-up traffic until he reached the crest of the Lakeshore Drive overpass. Although Williams could not testify, it appears that he moved from the right lane into the left lane when he saw the stopped traffic ahead. His truck struck the overpass bridge rail, and the truck vaulted over the bridge rail and onto the street below. Williams suffered serious injuries including a closed head injury which has completely incapacitated him.
This suit was brought on behalf of Williams by his curator and stepfather, Harry Odom, and by Jennifer Ann Gobert on behalf of Williams' two minor children. Suit was originally filed against the City of Lake Charles and the Lake Charles Police Department alleging that the City and the Police Department knew or should have known of the dangerous and hazardous condition created by the backed-up traffic, resulting from the prior accident on the Calcasieu River Bridge, and that the officials of the City and the Police Department failed to adequately control the traffic situation and warn oncoming motorists. Subsequently, the State of Louisiana through the Department of Transportation and Development (DOTD) was added as a defendant with the Plaintiffs alleging that the DOTD was strictly liable. The Department of Public Safety and Corrections was also named as a defendant but was later dismissed by summary judgment.
In 1998 the City and the Police Department settled with the Plaintiffs. Plaintiffs and the DOTD entered into a stipulation that the DOTD reserved its right to assert the fault of the City and the Police Department.
A four-day bench trial took place in January 2000. The DOTD was found 60% at fault, and the City was found 40% at fault. Williams was awarded $1,026,440.13 in past medical expenses, $2,230,207.23 in future medical expenses, $426,480.02 in past lost wages, $1,331,148.25 in future lost wages, and $4,000,000 for past, present, and future physical and mental pain, suffering, and disability, including loss of enjoyment of life. Each of the two minor children was awarded $200,000 for loss of consortium.
A judgment was signed on January 24, 2000. The judgment was amended to add language concerning the loss of consortium award and to add legal interest. Both the DOTD and Odom, on behalf of Williams, appeal the judgment.

FAULT
One of the main issues raised on appeal is the fault assessed by the trial court. The DOTD claims that the trial court erred in assessing it with any fault for the accident. It argues that Williams should be assessed with fault and that the fault of the City and the Police Department should be increased. Odom claims that the fault of the DOTD should be increased and that the fault of the City and the Police Department should be reduced.

Fault of the DOTD
In assessing 60% of the fault to the DOTD, the trial court found that it violated the American Association of State Highway and Transportation Officials (AASHTO) standards and guidelines and Louisiana standards and guidelines in the *54 construction of the curb, parapet, and handrail, components of the bridge rail. It found that the bridge rail was substandard. The court found that the handrail was merely "ornamental" and not an integral part of the curb and parapet. The DOTD assigns error to these findings.
It is well-settled that a reviewing court may not overturn the trial court's findings of fact unless they are clearly wrong. Cormier v. Comeaux, 98-2378 (La.7/7/99); 748 So.2d 1123. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Id.
The claim against the DOTD is based on strict liability. The accident happened in 1991. The supreme court has held that Louisiana Revised Statute 9:2800 which added an element of "actual or constructive notice" to the "strict liability" cause of action was unconstitutional until November 23, 1995, when the legislature passed Acts 1995, No. 828, which constitutionally allowed the legislature to limit by law the circumstances in which the State will be liable. Jacobs v. City of Bunkie, 98-2510 (La.5/18/99); 737 So.2d 14. Since this accident was in 1991, the Plaintiffs were only required to prove the traditional elements of strict liability under Louisiana Civil Code Article 2317. Dupree v. City of New Orleans, 99-3651 (La.8/31/00); 765 So.2d 1002; Irion v. State ex rel. DOTD, 98-2616 (La.App. 1 Cir. 5/12/00); 760 So.2d 1220, writ denied, 00-2365 (La.11/13/99); 773 So.2d 727. Therefore, the plaintiffs had to prove that: (1) the DOTD owned or had custody of the thing that caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm to others; and (3) the defect was a cause-in-fact of the accident. Id.
DOTD has a legal duty to maintain the highways in a reasonably safe condition. Sinitiere v. Lavergne, 391 So.2d 821, 824 (La.1980). This duty "extends to the protection of those people who may be foreseeably placed in danger by an unreasonably dangerous condition." Sinitiere, 391 So.2d at 825. It extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Trahan v. State, Department of Transportation & Development, 536 So.2d 1269, 1273 (La. App. 3rd Cir.1988), writ denied, 541 So.2d 854 (La.1989). DOTD cannot knowingly allow a condition to exist which is a hazard to a reasonably prudent driver. In such a case, DOTD must take reasonable measures to eliminate or reduce the risks associated with the dangerous condition or may post adequate signs to warn the public of the danger, risk, or hazard involved. Trahan, 536 So.2d at 1273.
. . . .
Whether the roadway at the scene of the accident was in an unreasonably dangerous condition, will depend on the facts and circumstances of each case. Hunter v. Department of Transportation and Development, 620 So.2d 1149, 1151 (La.1993). DOTD cannot escape liability by simply showing that highway met the existing standards when it was built. Aucoin v. State, Department of Transportation and Development, 97-1938, 97-1967, p. 6-8 (La.4/24/98), 712 So.2d 62, 66-67. Design standards both at the time of original construction and at the time of the accident may be relevant factors in determining whether a given stretch of roadway presents an unreasonable risk of harm, but are not determinative of the issue. Dill v. State, Department of Transportation and Development, 545 So.2d 994, 996 (La.1989). Although DOTD does not have a duty to *55 bring old highways up to modern AASHTO standards absent a major reconstruction of that highway, see Cormier, 98-2378 at 9, 748 So.2d at 1129, whether DOTD has conformed to those standards is a relevant factor in determining the ultimate issue of whether the roadway is unreasonably dangerous. Aucoin, 97-1938, 97-1967 at 7, 712 So.2d at 66.
The unreasonable risk of harm criterion entails a myriad of considerations and cannot be applied mechanically. Oster v. Department of Transportation and Development, State of Louisiana, 582 So.2d 1285, 1288 (La.1991). Although courts have described the unreasonable risk of harm criterion as requiring the reviewing court to balance the likelihood and magnitude of harm against the utility of the thing, the balancing test required by the unreasonable risk of harm criterion does not lend itself well to neat, mathematical formulations. Cormier, 98-2378 at 8, 748 So.2d at 1128. In addition to the likelihood and magnitude of the risk and utility of the thing, the interpreter should consider a broad range of social, economic, and moral factors including the cost to defendant of avoiding the risk and the social utility of the plaintiffs conduct. Oster, 582 So.2d at 1288.
Sevario v. State ex rel. Dept. of Transp., 98-1302, pp. 14-15 (La.App. 1 Cir. 11/10/99); 752 So.2d 221, 231-32, writs not considered, 99-3638 (La.4/7/00), 759 So.2d 81,, 00-0044 (La.4/7/00); 759 S.2d 82, writ denied, 99-3457 (La.4/7/00); 759 So.2d 760 (footnote omitted).
In the present case, it was stipulated that the bridge rail was in the care, custody, and control of the DOTD. The DOTD disputes that the bridge rail had a defect that presented an unreasonable risk of harm, and that the defect was the cause-in-fact of the Plaintiffs' damages.
The plans for the construction of this part of I-10 in Lake Charles were approved in 1958. According to testimony, the project began around 1959 and was completed around 1962.
The bridge rail was designed and built for the purpose of keeping vehicles from running off the bridge. Testimony revealed that the curb which was part of this bridge railing system was for pedestrians whose vehicles may have stalled. In 1957 the AASHTO guidelines called for a preferable curb height of twelve inches but a minimum height of nine inches with a roadway railing minimum height of two feet three inches to a maximum height of three feet six inches above the roadway adjacent to the curb. In this case the curb was ten inches high. The vertical wall on top of the curb is called a parapet. The inner face of the parapet was offset a foot or more from the inner face of the curb. The parapet was twelve and one-half inches high. Placed on top of the parapet was an aluminum railing, sometimes referred to as a handrail. This railing was eleven inches high.
The main defect was the curb design and its tendency to cause vehicles to vault. There was considerable testimony about this. Hossein Ghara, a bridge engineer administrator with the DOTD, agreed that the curb design of this bridge is what caused the Williams vehicle to vault. What caused the vaulting was the offset between the inner faces of the curb and parapet. The bridge rail did not present a solid vertical surface to keep a vehicle on the roadway. The DOTD argues that as of 1991 there had been no major reconstruction on this bridge, so the DOTD had not been required to bring it up to modern standards by eliminating that offset. It further argues that the Federal Highway *56 Administration had not issued any mandate to update this bridge. The evidence showed otherwise.
As early as 1959, the Bureau of Public Roads (now the Federal Highway Administration) warned that the safety walk and parapet design might not adequately contain vehicles. In April 1962, the federal government published "Proposed Specifications for Bridge Railings" which recommended raising the parapet nine inches when the rail design included a safety walk. In 1964, AASHTO published interim specifications for bridge rail design because of changes and discoveries deemed too important to wait for the next annual publication. These interim specifications mandated removal of the safety walk or raising the height of the parapet an additional nine inches. The next major move toward the safety of bridge railings was in AASHTO's 1967 "Yellow Book," stating that "[m]any bridge parapets are hazardous because of existing `safety walks' which allegedly cause vehicles to bounce over the parapet." The "Yellow Book" called for the elimination of safety walks from future designs, and, to the extent practical, from existing bridges.
Morris Bronstad, a consulting engineer, testified that Louisiana developed a retrofit design in 1975 which consisted of a concrete block placed on top of the safety walk, or curb, to eliminate the safety walk. This retrofit design was never used. Testimony revealed that approach guardrails had been placed on the bridge in 1967. Bronstad testified that the approach rail could have been carried up through the bridge rail to eliminate the safety curb and provide a solid wall to prevent vaulting. This was never done either.
A retrofitted rail would have unquestionably eliminated the vaulting effect, Bronstad opined, thereby redirecting the Williams vehicle back onto the highway. Everybody agreed that there might still have been an accident, but that it would not have been as severe. There might have been an accident on the highway, but the vehicle would not have vaulted off I-10 and onto the street below. While the DOTD "has no duty to bring old highways up to current safety standards, unless the highway has undergone major reconstruction,....[it still] has a duty to correct conditions existing on old highways that are unreasonably dangerous." Cormier, 748 So.2d at 1131.
Another defect found by the trial court was the height of the rail system. The higher the system the more likely it would contain a vehicle and keep it from running off the bridge. The height issue raised the question of whether the handrail on top of the parapet was part of the bridge railing or just ornamental. The trial court ruled that it was ornamental, so the curb height of ten inches plus the parapet height of twelve and one-half inches was below the minimum height of twenty-seven inches recommended by AASHTO at the time of construction.
Bronstad was an expert in roadside safety and bridge rails. The subject of roadside safety is based on anticipating vehicles leaving the roadway. He testified that the aluminum rail did not meet the substantial rail qualifications of 1957 AASHTO recommendations so it should not even be considered part of the railing. Bronstad also relied on the AASHTO recommendation that "[r]oadway railings preferably shall be designed in such manner as to present smooth longitudinal surfaces on the traffic side, unbroken by the vertical posts or any other projections." He testified that even if you consider the metal rail part of the railing it violated AASHTO standards because the railing was offset from the face of the parapet and that the posts were projecting in front of *57 the railing. He testified that these posts were like little ramps and that the railing offset also acted like a ramp which, if anything, would enhance the vaulting effect. The rail was set back one foot from the concrete face.
Ghara, for the DOTD, testified that the metal rail should be included as part of the bridge railing measurement. He stated that the metal railing would be considered ornamental today but it met criteria of the loading conditions for the time it was designed. He agreed that the bridge railing did not meet AASHTO specifications for 1965, but testified that it did meet the standards when the bridge was constructed. There was some theorizing on whether the railing was turned the right way. It was placed so that it curved out, and the Plaintiffs argued that it should have been curved in. Ghara testified that the rail was not substantial enough to snag the vehicle so it would not really matter which way the rail was turned.
Richard Robertson, a consulting engineer, testified that this was a common bridge rail used all over the United States and that the bridge rail met AASHTO standards at the time the overpass was built. He also agreed that AASHTO made changes in 1965 that would render this design obsolete. Robertson opined that even if there had been another three to five inches of concrete, Williams would still have vaulted over the side. There was evidence that the Williams vehicle had struck the metal railing, but that it only "snagged" the railing.
There was expert testimony that the trial court could rely upon to find that this bridge rail did not conform to AASHTO standards as they existed when the bridge was built. There was sound expert testimony in the record that this bridge rail design violated AASHTO height standards at the time it was constructed, and that this violation caused the vaulting of the Williams vehicle. By 1967, AASHTO recognized and informed everyone that this design was dangerous and should be eliminated from existing bridges when practical. The curb and parapet/rail configuration could not do its job of keeping the vehicle on the bridge. This was an unreasonably dangerous condition.
There was testimony that inexpensive methods were available to retrofit the bridge rail and eliminate the hazard associated with the curb. The DOTD chose not to utilize these methods, electing to wait until major reconstruction was performed. Although the DOTD is given time to remedy these situations, we find that it should have done so by 1991 when this accident occurred. The DOTD cannot seek protection behind the "major reconstruction" defense for as long as it likes when it has knowledge that an unreasonably dangerous condition exists. The DOTD failed to prevent the thing in its custody from causing an unreasonable risk of injury to others, and its fault is based upon that failure. Dupree, 765 So.2d 1002. The trial court was correct in finding that the DOTD was liable for this accident.
All experts in the case agreed that the curb and rail configuration caused the Williams vehicle to vault over the bridge rail. The Plaintiffs proved that the defect was a cause-in-fact of the accident.

Louisiana Revised Statute 9:2798.
The DOTD argues that even if it is liable for this accident, the trial court erred in failing to grant summary judgment finding it immune from fault pursuant to Louisiana Revised Statute 9:2798.1, the discretionary function exception to tort liability applicable to governmental entities. The DOTD argues that all allegations of fault against it focus directly on the discretionary acts of the public bodies and general policy making decisions of the *58 public bodies and that it is immune from liability pursuant to Subsection (B) of this statute which states:
Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
The DOTD argues that its decision to build the bridge rail system as it did in 1959 and then not to institute wholesale retrofits of the 150 miles of identical bridge rail systems in the state prior to Williams' accident in 1991 were decisions that represented the exercise of discretion. It therefore claims immunity under Louisiana Revised Statute 9:2798.1.
In Valet v. City of Hammond, 577 So.2d 155 (La.App. 1 Cir.1991), the First Circuit recognized that the duty of an entity to maintain roads in its jurisdiction was one imposed by law. It went on to explain:
Whether or not to assume the duty to maintain the roads within their jurisdiction is not a policy-making or discretionary function.... There is simply no decision to be made; the duty to maintain the roads in a reasonably safe condition exists depending on the location and classification of the particular road involved.... [T]he DOTD ... cannot decide what level of maintenance to provide; it must maintain the road in a reasonably safe condition. Failure to do so results in liability to those injured by the unreasonably dangerous condition.
Of course, the decision to repair or perform maintenance on a particular road, and the extent of the repairs or maintenance, is a decision which the authority responsible for the upkeep and maintenance of that road ... must make. However, this is an operational decision, not a policy-making or discretionary function decision for which La. R.S. 9:2798.1 provides immunity.
Valet, 577 So.2d at 166-67.
Expanding on Valet, the First Circuit in Chaney v. National R.R. Passenger Corp., 583 So.2d 926, 929 (La.App. 1 Cir.1991), stated that if Louisiana Revised Statute 9:2798.1 provided immunity for decisions regarding the manner to maintain roadways in a reasonably safe condition, then governmental entities charged with maintaining roadways would enjoy immunity "for wholesale dereliction of this duty." The court went on to state that "the only policy decision that a governmental authority can make relating to a roadway, is whether or not to construct it (or assume responsibility for it in some cases) in the first place." Id. at 930.
Once that decision is made, related decisions such as the design, method of construction, number and placement of signs and signals, level of maintenance, etc. are operational decisions. If the effect of these decisions is that the roadway is made reasonably safe for travel, then the governmental authority responsible has no liability for accidents occurring thereon.
Id. (citation omitted).
We agree with the First Circuit that determination of whether this unreasonably dangerous curb and bridge railing should be improved was an operational decision and not a policy-making or discretionary function decision. The DOTD is not entitled to immunity under Louisiana Revised Statute 9:2798.1.

Fault of Michael Williams
The DOTD argues that the trial court erred in not assessing any fault to Williams for the accident. It argues that Williams failed to maintain control of his vehicle and was not attentive at a time *59 when he had a duty to maintain a careful lookout, observe any obstructions present, and exercise care to avoid them. Odom claims that Williams was not liable because he was faced with a sudden emergency that led him to contact the defective bridge rail.
The sudden emergency doctrine is available to a person who finds himself or herself in a position of imminent peril and does not have sufficient time to consider and weigh all of the best means available to avoid that impending danger. Such a person is not guilty of negligence if he or she fails to adopt what subsequently and upon reflection may have been a better means to avoid the peril.
Babineaux v. Tollie Freightways, Inc., 628 So.2d 1327, 1330 (La.App. 3 Cir.1993).
The parties have stipulated that the Lake Charles City Police have responsibility for this accident in not properly directing traffic following the first accident. There is no contention that Williams was speeding. Several people, who were also on their way to work and knew Williams, testified that they were driving 55 miles an hour when they passed him while he was in the left lane shortly before the accident. It was a clear, dry morning.
There was also testimony that it was not evident that traffic was backing up on the Calcasieu River Bridge until the observing vehicle neared the top of the Lakeshore Drive overpass. John Delahoussaye, who knew Williams from work, testified that he was in the left lane of travel and passed Williams between the Enterprise Boulevard overpass and the Lakeshore Drive overpass. Delahoussaye stated that when he reached the top of the Lakeshore Drive overpass, he noticed traffic ahead of him was stopped. He had to press pretty hard on his brakes to stop. Delahoussaye told the investigating officer that he heard screeching tires, looked in his rearview mirror and saw Williams changing lanes, but then lost sight of him.
James Lock, an accident reconstructionist who testified for the Plaintiffs, concluded that Williams came to the crest of the Lakeshore Drive overpass and was faced with an emergency because the vehicles were queueing and braking suddenly. Lock explained that the vehicles to arrive first after the earlier Calcasieu River Bridge accident had plenty of time to stop, but that as the traffic queue lengthened, perception was delayed and the response time shortened. He believed that Williams moved from the right lane into the left lane, and either over corrected or something happened, and the left front wheel struck the curb. It rose over the curb and struck the parapet and handrail, traveled to the other side of the opening, struck the other bridge, (the eastbound Lakeshore Overpass Bridge) and hit the abutment.
Richard Robertson, DOTD's consulting engineer, was of the opinion that since Williams was going at a slower rate of speed, he should have been able to stop. He explained that other people were able to stop, including people driving faster than Williams and that there were no accidents after Williams' accident.
Both accident reconstruction experts agreed that even if the bridge rail had been retrofitted, there would have still been an accident, but Williams would have been redirected back into traffic instead of going off the bridge. Although Williams may have been faced with a sudden traffic problem, we do not find that it was such an emergency as to excuse his actions. Everyone before and after Williams was able to stop and avoid an accident. We can never know for sure, but it is likely that Williams was either inattentive when he came upon the stopping traffic or he overreacted *60 as Lock suggested. Williams impacted the bridge rail by his own actions. He must share some responsibility.

APPORTIONMENT OF FAULT
The DOTD argues that it was assessed too much fault while Odom claims it was assessed too little. The DOTD also argues that the City should have been assessed with more fault. Having found that the trial court erred in finding that Williams was not at fault for this accident, we must adjust the allocation of fault giving deference to the trial court's allocation of fault. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607.
In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), the supreme court explained that, to determine the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligence conduct and the harm to the plaintiff and considerations in determining the relative fault of the parties.
In Campbell v. Louisiana Dept. of Transp. & Dev., 94-1052 (La.1/17/95); 648 So.2d 898, the supreme court found that the failure of the DOTD to install guardrails on a bridge was a cause-in-fact of the accident which resulted in the death of a passenger after the driver of the automobile fell asleep and veered onto the shoulder and the automobile struck the bridge abutment on the opposite side of the road. In finding fault with the DOTD the supreme court held that even though the lack of guardrails did not cause the driver to lose control of his vehicle, the negligence of the driver as well as the failure of the DOTD to place guardrails on the bridge combined to cause harm to the guest passengers in the vehicle and the DOTD's conduct was a substantial factor in causing the injuries. The supreme court found that the trial court was not clearly wrong in its allocation of fault of 75% to the DOTD.
In the present case the parties stipulated that the City had some responsibility, and we have found that Williams' actions contributed also. The City failed to get a unit to this overpass for warning purposes before this accident. Ronnie Chapman, who is now retired from the City Police force, testified that when there is an accident like this one, they try to manage traffic by putting a police car on each overpass. If they run out of available City officers, they will call the State Police or Sheriff's Department. That was not done in this case because all available units had been dispatched.
The bridge rail system which caused the vehicle to vault off the bridge was the direct cause of the severe injuries suffered by Williams. The experts agreed that if the bridge rail had redirected Williams back into the traffic, there might still have been an accident, but the injuries would not have been as severe. Therefore, the trial court was correct in assessing the majority of the fault for this accident with the DOTD.
*61 We find that the trial court's assessment of 60% of the fault to the DOTD was proper. However, we find that the City should have been assessed only 35% of the fault. We find that the lowest reasonable amount that can be assessed to Williams is 5% of the fault.

DAMAGES
Odom contends that the trial court's awards of general damages and future medical expenses were erroneously low. The award for general damages was $4,000,000, and the award for future medical expenses was $2,230,207.23. We will review each of these awards.

General Damages
We are mindful of the role of an appellate court in reviewing general damage awards as explained in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), and recently reiterated in Duncan v. Kansas City Southern Railway Co., 00-66, pp. 13-14 (La.11/3/00); 773 So.2d 670, 682-83 (citations omitted):
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms." Vast discretion is accorded the trier of fact in fixing general damage awards. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. As we explained in Youn:

Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.
. . . .
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion.
At the time of the accident, Williams was 29 years old. He had attended McNeese State University for one year and Sowela Tech for 18 months. He was an operator at Conoco. Williams was living with and engaged to be married to Jennifer Gobert. They had a son and daughter together, Cody and Crystal. Cody was born in 1989, and Jennifer was two and one-half months pregnant with Crystal when Williams had his accident in 1991. Testimony established that Williams had a close relationship with his son.
As a result of the accident, Williams suffered brain damage which put him in a semi-vegetative state. Following the accident, Williams was taken to St. Patrick Hospital and remained there two months. He was then taken to American Transition in Houston for three months. He underwent surgeries for removal of a blood clot, insertion of a monitor, installation of a *62 trachea, installation of a PEG, or feeding tube, and installation of a shunt. The PEG tube and the shunt are still in place. The shunt is used to drain a buildup of cerebral spinal fluid from the brain into the abdomen. He is still fed by the PEG tube because he has lost the functional ability to swallow and to eat.
Dr. Kevin Gorin testified that Williams suffered a severe traumatic brain injury. Initially, Williams was having continuous physical problems with muscle tightness, contractures, and spasticity as well as post-traumatic seizure disorder.
Once he was released from the hospital he went to live with his mother and stepfather because he cannot do anything for himself and requires 24-hour supervision. He is either bed bound or wheelchair bound. He has to be strapped in the wheelchair. He is functionally a quadriplegic due to his brain damage, with only a little movement in his right hand. Williams is managed with a condom catheter at night and diapers during the day.
Williams' parents' home had to be remodeled to accommodate the special equipment that is needed to care for him. In addition to a hospital bed, a wheelchair, physical therapy equipment, and other special equipment, a special pulley system had to be installed to help move him. Special vehicles are required to transport him.
Dr. Gorin testified that Williams has reached maximum medical improvement. He will always need 24-hour supervision. He has abnormalities in his motor skills and continues having contractures and spasticity which will not improve. Williams remains at risk for the litany of medical problems and complications that someone with a traumatic brain injury is subject to.
Although a higher award may have been more appropriate in this case, we cannot say that the trial court abused its discretion. We do not find the award of $4,000,000 to be unreasonably low.

Future Medical Damages
Odom argues that the future medical damages award should be increased. Dr. Gorin developed a life care plan for Williams. The parties stipulated to the life care plan which established the future medical care needs and costs. However, each of the parties submitted different economic evaluations on the present-day value of the costs associated with the life care plan. The trial court awarded $2,230,207.23 for future medical expenses. This amount was slightly higher than the valuation calculated by the DOTD's expert, but much less than that of Williams' expert.
"Future medical expenses must be established with some degree of certainty. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost." Duncan, 773 So.2d at 685. The future medical expenses are not at issue; only the present-day value of those expenses is at issue.
Joan Martin, a CPA who testified for the Plaintiffs, calculated the present-day value of the future medical expenses at $4,201,632.21. Dan Cliffe, also a CPA, testified for the DOTD and calculated the present-day value at $2,167,800.
The differences in the calculations are the result of the use of different growth rates and different discount rates. Martin testified that she used the consumer price index and a specific growth rate for each item. She used a growth rate range of 5.85% to 5.87%. As an example of why different growth rates for different items were used, Martin stated that prescription drugs grow at a faster rate than something like a set of crutches or other medical *63 commodities. She relied on the CPI Detailed Index published monthly by the U.S. Department of Labor, Bureau of Labor Statistics. Martin also noted that the calculations submitted by Cliffe did not account for Williams' mobility aids, like wheelchairs and vans, wearing out. Cliffe agreed that he failed to account for wear and tear and his calculations would have to be adjusted. Martin's calculations also included future medical visits which Dr. Gorin testified would be necessary, whereas Cliffe's did not.
Cliffe testified that his calculations were consistent with economic conditions that exist today and can reasonably be expected in the future. He used a growth rate average of 3%. He thought that growth rates used by Martin for medical services were too high. His explanation was:
[T]he Federal Government has done quite a lot during the 1990's to squeeze additional costs out of the system, and those pressures are still in effect certainly as they relate to medical care for all and forfor prescription prices. I think that's going to be a major issue in the campaign this year.
Thus, it is clear that his lower growth rate was based on his anticipation that the federal government would force the reduction of medical costs.
We note that the trial judge accepted Martin's discount rate in the calculation of economic loss, as to which no error has been assigned by either party. Martin used the same discount rate in her calculation of the future medical damages award.
We find that the trial court erred in accepting Cliffe's valuation of the present day value of future medical expenses. It is speculative to anticipate that the federal government will compel a reduction in the cost of medical care, and on that ground alone justify the use of lower growth rates. Martin's estimates were based on the consumer price index and other historical data of past economic conditions, as well as relevant government publications. We find that Martin's calculations were established with a higher degree of certainty. Therefore, we increase the award for future medical expenses to $4,201,632.21.

INTEREST ON JUDGMENT
On March 13, 2000, an order was entered to amend the final judgment to include legal interest. The DOTD claims this was error.
We agree that an amendment to a final judgment to add interest is a substantive change which is not permitted pursuant to Louisiana Code of Civil Procedure Article 1951. Scruggs v. Minton Equipment Co., Inc., 98-987 (La.App. 3 Cir. 12/9/98); 722 So.2d 130.
However, Odom is entitled to have the judgment amended by appeal to include legal interest. Dufrene v. Duncan, 93-403 (La.App. 1 Cir. 3/11/94); 634 So.2d 19. This is because an award of legal interest in tort cases is not discretionary with the court since interest attaches automatically until judgment is paid, whether prayed for in the petition or mentioned in the judgment. La.Code Civ.P. art.1921; La.R.S. 13:4203; Dufrene, 634 So.2d 19. Therefore, we amend the judgment to include legal interest from the date of judicial demand.
For these reasons the judgment of the trial court is reversed insofar as it found no fault on the part of Williams. It is amended to include an allocation of fault to Michael Williams and to reduce the fault of the City of Lake Charles. Fault is allocated as follows: 60% to the DOTD, 35% to the City of Lake Charles, and 5% to Michael Williams. The judgment is also amended to award future medical expenses in the amount of $4,201,632.21 and to include *64 legal interest from the date of judicial demand. The judgment is affirmed in all other respects.
Costs of this appeal are to be shared equally between the DOTD and Harry Odom as curator for Michael Williams.
REVERSED IN PART; AMENDED IN PART; OTHERWISE AFFIRMED.